**STRIS & MAHER LLP**
PETER K. STRIS (SBN 216226)
 peter.stris@strismaher.com
BRENDAN S. MAHER (SBN 217043)
 brendan.maher@strismaher.com
MICHAEL DONOFRIO (*pro hac vice* pending)
 michael.donofrio@strismaher.com
RACHANA A. PATHAK (SBN 218521)
 radha.pathak@strismaher.com
725 South Figueroa Street, Suite 1830
Los Angeles, CA 90017
T: (213) 995-6800 | F: (213) 261-0299

Attorneys for Plaintiffs DAVITA INC.
and STAR DIALYSIS, LLC

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVITA INC. and STAR DIALYSIS, LLC, | Case No. 3:18-cv-6975 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| AMY'S KITCHEN, INC. EMPLOYEE BENEFIT HEALTH PLAN and AMY'S KITCHEN, INC, | |
| Defendants. | |

S T R I S | 725 S. FIGUEROA ST. STE 1830
M A H E R | LOS ANGELES, CA 90017

1.     Plaintiffs DaVita Inc. and Star Dialysis, LLC (collectively "DaVita") provide life-sustaining dialysis treatment to beneficiaries of Defendant Amy's Kitchen Employee Benefit Health Plan ("Amy's Plan" or "Plan") who suffer from end-stage renal disease ("ESRD"). Plan beneficiaries with ESRD historically enjoyed access to care through the same network of providers that is available to all other beneficiaries. And until 2017, the Amy's Plan paid DaVita an "in-network" rate determined by DaVita's contractual commitment to serve as a network provider, a rate significantly lower than the usual and customary rates DaVita charges.

2.     But as of January 1, 2017, the Amy's Plan eliminated network coverage and dramatically reduced reimbursement for dialysis—while maintaining its existing network and reimbursement practices for all other health care services. It did so by hiring Renalogic, Inc. ("Renalogic"), an Arizona-based company that purports to specialize in "dialysis cost containment." *Renalogic*, renalogic.com, *last accessed* November 1, 2018. Renalogic helps companies "contain" the cost of dialysis, however, by illegally upsetting the allocation of payment responsibility between Medicare and private payors that Congress struck with the passage of the Medicare as Secondary Payer Act ("MSPA").

3.     Individuals with ESRD are entitled to Medicare regardless of age or financial status. For many years, this led private insurers to push ESRD sufferers off their private insurance and onto Medicare—meaning the federal fisc bore virtually the entire weight of treating ESRD. The MSPA inverted this status quo, making "private insurers . . . the 'primary' payers and Medicare the 'secondary' payer" during an individual's first 30 months of ESRD-based Medicare eligibility. *Bio-Medical Applications of Tenn. v. Cent. Sts. Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 278 (6th Cir. 2011). The MSPA accomplished this goal by prohibiting private insurers from taking steps that could prematurely shift ESRD individuals to Medicare.

4.     With Renalogic's assistance, the Amy's Plan has violated this foundational principle. Put simply, since January 1, 2017, Plan beneficiaries with

S T R I S
M A H E R

725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017

ESRD have faced enormous additional payment obligations under the Amy's Plan that are not faced by Plan beneficiaries who do not have ESRD. This is because Plan beneficiaries with ESRD (1) no longer have a genuine in-network option for dialysis, and (2) the out-of-network option for dialysis is financially worse for Plan beneficiaries than the out-of-network options for other medical treatments.

5.     Neither DaVita nor any other dialysis provider can treat Amy's Plan beneficiaries indefinitely without receiving appropriate compensation. Providers may choose not to treat Plan beneficiaries at all, or they may charge them the unpaid balance for the care rendered. The Amy's Plan has thus jeopardized the lives and livelihoods of its most vulnerable beneficiaries.

6.     The Plan's conduct has created dramatic incentives for individuals with ESRD to drop out of the Amy's Plan altogether and instead rely on Medicare. The reason why is simple: their Medicare payment obligations would be significantly lower than the immense payment obligations that the Plan's conduct now exposes them to. To be sure, the Plan saves money on dialysis when beneficiaries with ESRD move to Medicare, but such attempts to "shift[] costs from private plans to the public fisc w[ere] exactly the evil that the [Medicare as Secondary Payor] Act sought to correct." *Bio-Medical Applications*, 656 F.3d at 282-83.

7.     To make matters worse, the Amy's Plan has all the while kept beneficiaries and providers in the dark about these sweeping changes. Plan beneficiaries received no proper notice or explanation of either the elimination of network coverage for dialysis or of the change in claims-payment methodology. Nor do the Plan's terms justify the changes.

8.     Unsurprisingly, the law bars the Plan's conduct. Health plans cannot unfairly discriminate on the basis of certain health conditions; Amy's did. Health plans cannot mislead beneficiaries and providers about the material dimensions of coverage; Amy's did. And health plans cannot ignore Congress's command by creating draconian incentives for ESRD individuals to leave the plan for Medicare; Amy's did. DaVita—

both as assignee of a Plan beneficiary and in its own right—accordingly seeks relief under federal and state law.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. Jurisdiction over the state law claims alleged herein exists under 28 U.S.C. § 1367.

10.    ERISA provides for nationwide service of process. 29 U.S.C. § 1132(e)(2). All Defendants are either residents of the United States or subject to service in the United States. This Court therefore has personal jurisdiction over them.

11.    Venue is proper in this district because all Defendants are residents of this district, and a substantial part of the events giving rise to this action occurred in this district. 28 U.S.C. § 1391.

## PARTIES

12.    DaVita Inc. is a Delaware corporation with its principal place of business in Denver, Colorado. It is a leading provider of kidney care in the United States, with over 2,400 centers across the country, including more than 500 licensed facilities in California. As set forth below, DaVita Inc. sues both in its own right and as an assignee of its patient (Patient 1).

13.    Star Dialysis, LLC is a Delaware limited liability corporation that owns the facility that provided dialysis treatment and care to the patient described in this Complaint. As set forth below, Star Dialysis, LLC sues both in its own right and as an assignee of its patient (Patient 1).

14.    Defendant Amy's Kitchen, Inc. ("Amy's") is a California corporation with its headquarters in Petaluma, California and manufacturing facilities in Santa Rosa, California; Medford, Oregon; and Pocatello, Idaho. It sells organic foods (more than 250 products) throughout the United States and internationally, in over 23 countries. Amy's employs more than 2,400 people and generates $500 million in annual revenue.

15.    The Amy's Plan is an "employee welfare benefit plan" and an "employee benefit plan" within the meaning of ERISA. *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan" and "welfare plan"); 29 U.S.C. § 1002(3) (defining "employee benefit plan" and "plan"). It is subject to Title I of ERISA. *See* 29 U.S.C. § 1003(a).

16.    Amy's Kitchen is the sponsor and the plan administrator of the Amy's Plan. All Defendants and those working at their direction in connection with actions described herein exercised discretionary authority and discretionary control respecting management of the Amy's Plan; exercised authority and control over disposition of the Amy's Plan's assets; had discretionary authority and discretionary responsibility in the administration of the Amy's Plan; and were fiduciaries of the Amy's Plan within the meaning of 29 U.S.C. § 1002(21)(A).

17.    Participation in the Amy's Plan is reserved to eligible Amy's employees, retirees, and their dependents, and the purpose of the Plan is to provide them with medical and health benefits.

## GENERAL ALLEGATIONS

### I.    DaVita Provides Life-Sustaining Dialysis Treatment.

18.    Kidney failure, also called ESRD, is the last stage of chronic kidney disease. When a patient suffers from ESRD, it means that their kidneys have stopped working well enough for the patient to survive without dialysis or a kidney transplant.

19.    Dialysis is a procedure used to "substitute" for many of the normal functions of the kidneys, such as removing the waste products that the body produces throughout the day. When these toxins are not removed on a regular basis (typically three times per week), they build up in the body and cause serious health complications and ultimately death.

20.    Although hemodialysis is the most common treatment for people with ESRD, it is far from a routine medical procedure. A dialysis machine removes blood from the body, filters it through an artificial kidney, and then returns the cleaned blood.

Traditional, in-center dialysis is administered to a patient three times a week for about four hours each session.

21.    ESRD affected more than 787,000 people in the United States as of 2016, and the number of patients diagnosed with ESRD continues to rise each year. U.S. Renal Data System, *2018 USRDS annual data report: Epidemiology of kidney disease in the United States*, National Institutes of Health, National Institute of Diabetes and Digestive and Kidney Diseases, Bethesda, MD, 2018 ("2018 NIH Report"), Table B.1.

22.    As of 2016, the total annual hemodialysis cost in the United States was over $70 billion. *Id.*; *id.* at Table K.7.

23.    Congress and regulators have recognized that dialysis is essential. For example, Medicare Part B covers routine maintenance dialysis for people with ESRD regardless of their age or financial resources. In 2016, Medicare spent over $35.3 billion on services for beneficiaries with ESRD. *Id.*

24.    DaVita is a leading provider of this care in the United States. It treats almost 200,000 patients at over 2,400 centers across the country. In 2017, Fortune named DaVita one of the world's most admired companies for the tenth consecutive year—and the number one healthcare company for quality of service.

25.     DaVita provides dialysis treatment to individuals regardless of whether they have government-sponsored insurance (e.g., Medicare) or private insurance, often referred to as a commercial insurance plan (e.g., employer-sponsored insurance).

26.    When an individual has government-sponsored insurance such as Medicare, the government unilaterally sets the reimbursement rate. Payment rates under Medicare are generally significantly lower than rates paid by commercial insurance plans.

27.    Commercial insurance plans' rates differ depending on whether DaVita is in-network or out-of-network with the plan. When DaVita is "in-network," DaVita is paid a contractually negotiated rate. When DaVita is "out-of-network," it is generally

paid according to an industry standard that is commonly known as the "usual, customary, and reasonable" (UCR) rate. DaVita's out-of-network payment rates are on average higher than its in-network payment rates.

## II.   Before 2017, The Amy's Plan Covered Dialysis Like Other Services.

28.    DaVita offers dialysis to beneficiaries of the Amy's Plan. On information and belief, the Amy's Plan has always covered dialysis, and it currently covers dialysis.

29.    The Amy's Plan is a preferred provider organization ("PPO") health plan. A PPO plan incentivizes participants to select healthcare providers who have contracted with the plan—or with an entity affiliated with the plan, such as Anthem Blue Cross in California or another regional Blue Cross Blue Shield entity—for discounted rates. Many healthcare providers contract with PPO plans (or entities affiliated with plans) because the providers are willing to accept discounts in exchange for other benefits, such as streamlined claims processing and more reliable payment.

30.    The Amy's Plan provides "network" (or "in-network") coverage for healthcare services on the following terms: (1) beneficiaries visit healthcare providers in the Plan network; (2) the Plan pays network providers at contracted rates; and (3) beneficiaries face financial incentives to select network providers, such as lower copayments, coinsurance amounts, and/or deductibles. Moreover, in-network coverage generally protects beneficiaries from the responsibility to pay any charged amounts not paid for by the Plan, i.e., "balance billing."

31.    PPO plans such as Amy's also cover services rendered by medical providers who have not contracted with the Plan (or an affiliated entity). The Amy's Plan provides "out of network" (or "non-network") coverage for healthcare services on the following terms: (1) beneficiaries visit healthcare providers of their choosing; (2) the Plan pays non-network providers a percentage of what the Plan considers to be the "usual and customary" and "reasonable" rate for their services, and (3) Plan beneficiaries face financial disincentives to select non-network providers, including

higher copayments, coinsurance amounts, and/or deductibles, along with balance billing (the responsibility to pay any charged amounts not paid for by the Plan).

32.     Anthem Blue Cross and other regional Blue Cross Blue Shield entities have been third-party claims administrators for the Amy's Plan. In that capacity, they determine whether to process claims for benefits under the Plan on a network or non-network basis.

33.     Separate from any particular plan, Blue Cross entities have their own networks of contracted and preferred healthcare providers. That is, Blue Cross insurers across the country enter into contracts with providers that, among other things, establish in-network reimbursement rates for the providers' services. Plans then contract with the Blue Cross entities and gain access to these provider networks for their beneficiaries.

34.     DaVita has contracted with Blue Cross of Oregon (among other Blue Cross entities) to provide discounted dialysis treatment. Until December 31, 2016, Blue Cross of Oregon processed claims for treatment rendered by DaVita to Patient 1, an Amy's Plan beneficiary, on an in-network basis. As a result, DaVita received the rates it has negotiated with Blue Cross of Oregon, which are substantially lower than the usual and customary rates DaVita charges for its services.

35.     On information and belief, the Plan provided financial incentives to participants with ESRD to select DaVita and other dialysis providers who had contracted with a Blue Cross entity, such as lower copayments, coinsurance amounts, and/or deductibles. DaVita understood that it could not "balance bill" beneficiaries.

36.     Thus, until December 31, 2016, Amy's Plan beneficiaries had access to DaVita as an in-network provider even though DaVita had not directly contracted with the Plan.

**III.   Amy's and Renalogic Try To Cut The Plan's Dialysis Costs At The Expense Of Beneficiaries And Providers.**

37.   The Amy's Plan covers thousands of current or former Amy's employees and their family members. Patient 1, described in Paragraph 56 below, is one beneficiary of the Amy's Plan. However, based on data publicized by the National Institute of Health and the United States Census Bureau, statistically, it is likely that several Plan beneficiaries now suffer from ESRD. And the number of Plan beneficiaries with ESRD will probably continue to rise.

38.   Amy's bears the costs of treating those beneficiaries. The Plan is both insured and funded by Amy's, and the Plan funds health benefits through Amy's general assets and through maintenance of stop loss insurance.

39.   This case arises from the Plan's efforts to save money on dialysis treatment. Upon information and belief, the Plan recently contracted with Renalogic, an Arizona-based company that purports to specialize in "dialysis cost containment." *Renalogic*, renalogic.com, *last accessed* November 1, 2018. It claims to save payors "up to 91%" on dialysis. *Id.* To achieve the promised savings, however, Renalogic and the Plan implemented a new, dialysis-specific program with two illegal features.

**A.   Feature 1: No network coverage for dialysis.**

40.   On information and belief, the Amy's Plan effectively eliminated network coverage for *dialysis treatment only* as of January 1, 2017. Plan beneficiaries received no sufficient notice or explanation of any change in network coverage for dialysis.

41.   Beginning on or about January 1, 2017, the Plan was amended to include a "Dialysis Benefit Preservation Program." The Dialysis Program specifically carves dialysis treatment out of the Plan's approach to other medical benefits. Rather than following the general in-network / out-of-network approach described above, all dialysis-related claims are subject to "mandated cost review." That is, with respect to *dialysis only*, providers who would otherwise be considered in-network are no longer treated as in-network.

S T R I S | 725 S. FIGUEROA ST. STE 1830
M A H E R | LOS ANGELES, CA 90017

42.   The Plan suggests that it *might* be willing to enter into new agreements with some dialysis providers. However, these agreements appear to be patient-specific, and, on information and belief, the Plan will enter into such agreements only if the dialysis provider is willing to accept dramatically reduced reimbursement rates that are economically unsustainable.

43.   DaVita is not aware of any dialysis provider who has entered into an agreement with the Plan. And, DaVita itself has not entered into an agreement with the Plan, nor did the Plan approach DaVita to see if it could reach such an agreement.

44.   On information and belief, as a result of the dialysis carve out, the Plan's third-party claims administrator has processed *all* dialysis claims on a non-network basis since January 1, 2017. DaVita no longer receives the rates it has negotiated with Blue Cross of Oregon.

45.   On information and belief, plan participants with ESRD no longer have the option to choose network providers to get the corresponding benefits, such as lower copayments, coinsurance amounts, and/or deductibles. Plan participants also face the prospect of receiving bills for the amounts charged by providers that are not paid by the Plan, which can be financially devastating to the Plan participants.

46.   Since January 1, 2017, Plan beneficiaries with *other* conditions have continued to enjoy access to in-network providers, including providers who have contracted with a Blue Cross entity.

47.   In short, Plan participants with ESRD no longer have access to lower-cost network coverage for dialysis treatment. And providers who treat them can no longer accept discounts in exchange for other benefits, such as streamlined claims processing and more reliable payment. Because of the resulting increased financial exposure for patients, the Plan's arrangement with Renalogic threatens to push ESRD sufferers from the Amy's Plan to Medicare as their primary payer, an arrangement forbidden by the MSPA. *Bio-Medical Applications of Tenn. v. Cent. Sts. Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 282-83 (6th Cir. 2011) (explaining that attempts to

STRIS
MAHER

725 S. FIGUEROA ST. STE 1830
LOS ANGELES, CA 90017

1   "shift[] costs from private plans to the public fisc w[ere] exactly the evil that the Act
2   sought to correct").

3       **B.    Feature 2: Unfavorable payment methodology for non-network**
4           **dialysis providers.**

5       48.    In addition to removing any genuine in-network option for dialysis
6   treatment, the "Dialysis Benefit Preservation Program" also imposed a drastic, and
7   improper, rate reduction on out-of-network dialysis providers. On information and
8   belief, the Amy's Plan changed its methodology for calculating payments to non-
9   network *dialysis providers only* as of January 1, 2017. Plan beneficiaries did not
10  receive sufficient notice or explanation of this change.

11      49.    The Plan now purports to reimburse dialysis providers at a "Usual and
12  Reasonable" rate for dialysis. In contrast, providers of medical care other than dialysis
13  are paid a "usual and customary" and "reasonable" amount. An ordinary beneficiary is
14  likely to believe that "Usual and Reasonable" is identical or similar to "usual and
15  customary" and "reasonable," but that does not appear to be the case. The last sentence
16  of the 119-page "Plan Document and Summary Plan Description" says: "The term
17  'usual and customary' is not intended to be the same as the term 'Usual and
18  Reasonable,' as that term is defined in the Dialysis Treatment-Outpatient provision in
19  the Medical Expense Benefit section."

20      50.    The payments that DaVita has received reveal that "Usual and
21  Reasonable" is lower than its already reduced in-network rates, and indeed, that the
22  Plan has tied its reimbursement amount to the Medicare fee schedule. The Medicare
23  fee schedule, however, is far lower than the industry standard for an out-of-network
24  dialysis provider. The Medicare fee schedule is set by the federal government to define
25  the government's payor obligation. Usual, customary, and reasonable (UCR) rates, in
26  contrast, are based on the amount providers usually charge private insurance
27  companies in the relevant geographic area for a given service.

28

S T R I S | 725 S. FIGUEROA ST. STE 1830
M A H E R | LOS ANGELES, CA 90017

51.     The Plan did this, moreover, without disclosing the truth of what it is doing. The Plan carefully omits any reference to Medicare in its definition of "Usual and Reasonable."

52.     On information and belief, "usual and customary" and "reasonable" payments—which is what non-network providers of services *other than dialysis* are entitled to—are more favorable than rates based on Medicare.

53.     The Amy's Plan thus simultaneously (1) eliminated network coverage for dialysis, making beneficiaries responsible for all amounts not paid by the Plan, and (2) reduced non-network payout rates for dialysis providers only.

54.     This decision does far more than create a business dispute between DaVita and the Plan. It imperils the very lives of the Plan's ESRD beneficiaries, who depend on receiving dialysis treatment. DaVita cannot treat plan beneficiaries indefinitely without appropriate compensation—nor will any other dialysis provider. If the Plan's unlawful conduct persists, providers may eventually choose not to treat plan beneficiaries. Or they may charge beneficiaries the unpaid balance for care rendered. Amy's has thus jeopardized the lives and livelihoods of its most vulnerable beneficiaries.

## IV.    DaVita Admits and Treats Amy's Plan Beneficiaries.

55.     This suit arises from DaVita's provision of dialysis to an Amy's beneficiary, referred to as Patient 1 to protect his privacy.[1]

56.     Patient 1 has been receiving dialysis treatment from DaVita since 2016.

a.     Patient 1 was a member of the Amy's Plan at all relevant times and needed dialysis to treat ESRD.

---

[1] In an abundance of caution and out of concern for patient privacy, DaVita has not pleaded details about Patient 1's dates of service (other than year), treatment facility, or other identifying information. DaVita is willing to supply Defendants additional reasonable information to identify the patient. DaVita will supply information upon Defendants' request, but only in a manner that complies with all federal and state privacy laws.

S T R I S
M A H E R

725 S. FIGUEROA ST. STE 1830
LOS ANGELES, CA 90017

b.      Before treating Patient 1, DaVita representatives followed standard procedures for the intake and treatment of patients and the receipt of payment therefor.

c.      Those procedures include contacting Amy's Plan representatives to verify coverage, to receive authorization to provide treatment, and/or to exchange other necessary information.

d.      In connection with receiving treatment, Patient 1 executed a valid assignment of benefits ("Assignment") to DaVita. The Assignment gives DaVita the right to be paid directly for any services rendered to Patient 1, and it also entitles DaVita to assert Patient 1's legal rights under ERISA and other applicable law. These legal rights include the right to recover benefits, to file claims and appeals, to request and obtain information and documents relating to the plan, and to bring suit for violations of ERISA and other applicable law. The Assignment also appointed DaVita as the patient's "authorized representative."

e.      In the course of providing treatment to Patient 1, DaVita seeks payment from the Amy's Plan. DaVita does so by submitting the necessary information via the standard "UB-04" form, indicating, *inter alia*, the dates of treatment (for which DaVita was seeking payment) and the particular treatment provided. Each UB-04 also notifies the recipient that DaVita has obtained an assignment from Patient 1.

f.      Each UB-04 typically covers one week or less of treatment. Because Patient 1 has been receiving dialysis treatment from DaVita since 2016, DaVita has sent numerous completed UB-04 forms to the Plan, and the Plan has consistently sent payment to DaVita for its services.

g.      Until January 1, 2017, the Plan paid DaVita at its contracted rate with Blue Cross of Oregon. However, after January 1, 2017, the Plan paid DaVita at a Medicare-based rate that was far less than its contracted rate.

STRIS
MAHER

725 S. FIGUEROA ST. STE 1830
LOS ANGELES, CA 90017

h.  Pursuant to the Plan's internal appeal process, DaVita submitted two levels of appeal to the Plan's appeal administrator, Delta Health Systems. Delta denied the appeals and informed DaVita that it was entitled to file suit under ERISA. Patient 1's administrative remedies are therefore exhausted.

i.  Patient 1 continues to receive treatment from DaVita. The Plan has continued to authorize payment to be sent directly to DaVita, but at levels far less than DaVita's contracted rate with Blue Cross of Oregon.

57.  Payment of less than the full billed rate is an "adverse benefit determination" under ERISA. *See* 29 C.F.R. § 2560.503-1(m)(4) (defining "adverse benefit determination" as including "[a] denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part)" for a claimed benefit).

58.  ERISA requires plans making adverse benefit determinations to follow certain procedures.

a.  Generally speaking, plans must propound denials in writing, set forth the specific reasons for such a denial, and afford a reasonable opportunity for a full and fair review by the appropriate named fiduciary of the decision denying the claim. *See* 29 U.S.C. § 1133.

b.  Among other things, the plan or its representative must explain, "in a manner calculated to be understood by the claimant (i) the specific reason or reasons for the adverse determination; (ii) reference to the specific plan provisions on which the determination is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; [and] (iv) a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review. . . ." 29 C.F.R. § 2560.503-1(g)(i)-(iv). *See also* 29 C.F.R. § 2590.715-2719(b).

59.     The denials issued by the Amy's Plan do not all comply with ERISA's requirements. Accordingly, DaVita was entitled to file suit in federal court seeking relief under ERISA. *See* 29 C.F.R. § 2560.503-1(l) ("In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies . . . ."); 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F) (deemed exhaustion).

## COUNT ONE

### Against All Defendants

(Double Damages Under the MSPA)

60.     DaVita re-alleges each paragraph of this Complaint as if fully set forth herein.

61.     In the years preceding 2017, DaVita provided dialysis to Patient 1.

62.     DaVita was paid at an in-network rate specified in its contract with Blue Cross of Oregon, and the Plan's ESRD beneficiaries using DaVita for dialysis, such as Patient 1, faced cost-bearing and residual financial obligations in accord with being treated in-network.

63.     In 2017, the Amy's Plan singled out beneficiaries with ESRD for special and worse treatment than other members.

    a.     First, the Plan no longer treats dialysis providers that are part of the Blue Cross network as in-network providers. And, on information and belief, no dialysis provider has entered into an agreement with the Plan, so dialysis is no longer subject to in-network coverage (and the lower financial responsibilities that in-network coverage entails).

    b.     Second, the Plan slashed payment rates for out-of-network dialysis. Instead of using a "usual and customary" and "reasonable" payment methodology, the Plan adopted a Medicare-based method.

c.    As a result, the Plan's beneficiaries face substantial liability to out-of-network providers for the difference between what the Plan is willing to pay and the provider's billed charges.

64.    The Plan's practice violates the Medicare Secondary Payer Act. Medicare covers individuals with ESRD, regardless of age or financial resources. During an individual's first 30 months of Medicare eligibility, however, the individual's private insurer must continue to pay primary benefits on the individual's behalf. 42 U.S.C. § 1395y(b). The MSPA prevents insurers from shirking this payment responsibility and discriminating against individuals with ESRD. It does so in two key ways.

65.    First, the MSPA prohibits an insurer from "tak[ing] into account that an individual is entitled to or eligible for" Medicare based on ESRD. 42 U.S.C. § 1395y(b)(1)(C)(i). Binding regulations explain that this includes "[i]mposing limitations on benefits for a Medicare entitled individual that do not apply to others enrolled in the plan, such as providing less comprehensive health care coverage, excluding benefits, [or] reducing benefits." 42 C.F.R. § 411.108; *see id.* § 411.161(a). This provision is primarily designed to prevent insurers from shifting individuals with ESRD onto Medicare before the 30-month "coordination period" expires.

66.    Second, the MSPA prohibits an insurer from "differentiat[ing] in the benefits it provides between individuals having end stage renal disease and other individuals covered by such plan on the basis of . . . the need for renal dialysis, or in any other manner." 42 U.S.C. § 1395y(b)(1)(C)(ii). This provision is centrally designed to prevent discrimination against individuals with ESRD.

67.    Here, the Plan's conduct plainly violates both prohibitions. All *other* Plan beneficiaries have in-network options for care; Medicare-eligible ESRD beneficiaries do not. And all other beneficiaries receiving out-of-network care are entitled to payouts using a more generous method than the Medicare-based method the Plan uses *only* for dialysis providers. Put simply, Medicare-eligible ESRD beneficiaries (1) have no in-network option and (2) their out-of-network option is financially worse than the out-

S T R I S   |   725 S. FIGUEROA ST. STE 1830
M A H E R   |   LOS ANGELES, CA 90017

of-network option for those with conditions other than ESRD. This leaves Medicare-eligible ESRD individuals facing enormous additional payment obligations not faced by others on the Plan.

68.     Not only does this arrangement discriminate against ESRD individuals; it is plainly designed to induce them to drop out of the Amy's Plan and instead rely on Medicare. The reason: their Medicare payment obligations would be significantly lower than the payment obligations that the Plan's conduct now exposes them to. Although this would accomplish the Plan's goal of saving money on dialysis, it is *precisely* what the MSPA was enacted to prevent. *See Bio-Medical Applications of Tenn. v. Cent. Sts. Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 282-83 (6th Cir. 2011).

69.     Defendants' MSPA violation entitles DaVita to double damages under the MSPA's "enforcement" provision, which establishes "a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3)(A).

70.     This cause of action permits "a private party . . . to bring suit in the party's own name to remedy the wrong done to it" under the MSPA. *Woods v. Empire Health*, 574 F.3d 92, 98-99 (2d Cir. 2009) (also explaining the cause of action does *not* permit "suit on behalf of the Government to remedy any wrongs done thereto"); *see In re Avandia*, 685 F.3d 353, 359 & n.9 (3d Cir. 2012) (collecting cases explaining that the MSPA cause of action remedies private injury, not injury to the government). The cause of action contemplates suits both by plan beneficiaries and by healthcare providers like DaVita in their own right. *See Parra v. PacifiCare of Ariz.*, 715 F.3d 1146, 1152 (9th Cir. 2013); *Mich. Spine & Brain Surgeons v. State Farm*, 758 F.3d 787, 790 (6th Cir. 2014).

71.   Here, the Plan's failure to make required payments, in violation of the MSPA, has injured ESRD beneficiaries by exposing them to significant payment obligations. Dialysis providers are entitled to collect, and consequently beneficiaries are obligated to pay, the difference between the Plan's improperly low payment rate and the providers' usual and customary charges.

72.   The Plan's MSPA violations have also injured DaVita directly, by reducing its payments from the Plan to compensation amounts far below what it is entitled to.

73.   The MSPA cause of action thus entitles DaVita, both in its own right and as Patient 1's assignee, to recover double this amount in damages.

## COUNT TWO

### Against All Defendants

(Injunctive and Other Equitable Relief Under ERISA to Address Illegal Plan Terms)

74.   DaVita re-alleges each paragraph of this Complaint as if fully set forth herein.

75.   Separate from DaVita's ability to pursue relief directly under the MSPA, DaVita is entitled to use 29 U.S.C. § 1132(a)(3) of ERISA to seek redress for the Plan's conduct.

76.   No plan provision (or interpretation thereof) that violates federal law can be enforced to the detriment of a beneficiary. Such provisions or acts are void *ab initio*, and 29 U.S.C. § 1132(a)(3) permits Plaintiffs, as the beneficiary' assignees, to seek redress for the Plan's violation of the MSPA.

77.   In addition, ERISA itself forbids improper targeting of individuals based on their health condition. 29 U.S.C. § 1182(a)(1). The Secretary of Labor has made clear that this prohibition applies to discriminatorily *reducing* a certain type of benefit in the aftermath of costly participant claims. An example in the Code of Federal Regulations is illustrative:

(i) Facts. A group health plan has a $500 deductible on all benefits for participants covered under the plan. Participant B files a claim for the treatment of AIDS. At the next corporate board meeting of the plan sponsor, the claim is discussed. Shortly thereafter, the plan is modified to impose a $2,000 deductible on benefits for the treatment of AIDS, effective before the beginning of the next plan year.

(ii) Conclusion. The facts of this Example 2 strongly suggest that the plan modification is directed at B based on B's claim. Absent outweighing evidence to the contrary, the plan violates [ERISA].

29 C.F.R. § 2590.702(b)(2)(i). This tracks exactly what has happened here. In the aftermath of costly claims by at least one beneficiary with ESRD, the Plan eliminated in-network coverage and cut the payout rate for out-of-network coverage *just for people with ESRD*.

78.     Plaintiffs, as Patient 1's assignees, are entitled to an injunction under 29 U.S.C. § 1132(a)(3) of ERISA prohibiting the Plan from engaging in its illegal conduct going forward. Plaintiffs are also entitled to other appropriate equitable relief, including, but not limited to, reformation as required to conform the Plan to the requirements of federal law. Finally, Plaintiffs are entitled to attorneys' fees under 29 U.S.C. § 1132(g).

## COUNT THREE

### Against All Defendants

(Benefits Under ERISA)

79.     DaVita re-alleges each paragraph of this Complaint as if fully set forth herein.

80.     ERISA beneficiaries are entitled to receive the benefits promised under the terms of the plan of which they are members.

S T R I S
M A H E R

725 S. FIGUEROA ST. STE 1830
LOS ANGELES, CA 90017

81.   The terms of the Amy's Plan do not authorize the Plan to eliminate in-network coverage for ESRD beneficiaries seeking dialysis.

82.   Nor does the Plan allow Amy's to pay dialysis providers at the rate DaVita was paid here. Absent a contractual agreement establishing a negotiated rate, DaVita is entitled under the Plan to be paid a "Usual and Reasonable" charge. The Plan's definition of "Usual and Reasonable" does not permit the Plan to factor Medicare rates into its determination of what amount constitutes a "Usual and Reasonable" charge.

83.   Plaintiffs are entitled to relief under 29 U.S.C. § 1132(a)(1)(B), as well as attorneys' fees under 29 U.S.C. § 1132(g).

## COUNT FOUR

### Against All Defendants

(Equitable Relief Under ERISA for Failure to Disclose and Misrepresentation)

84.   DaVita re-alleges each paragraph of this Complaint as if fully set forth herein.

85.   Under ERISA, plan fiduciaries have an obligation to disclose in plain English all material terms of a plan to plan beneficiaries, and otherwise communicate honestly and comprehensively.

86.   No plan term can be enforced against a beneficiary or its assignees unless it is properly disclosed. *See CIGNA Corp. v. Amara*, 563 U.S. 421 (2011).

87.   The Plan failed to (1) adequately disclose to beneficiaries that there would be no in-network treatment for dialysis, and (2) that payment rates for dialysis would be significantly lower than for all other care, i.e., Medicare-based. In particular, the relevant Plan documents would lead a reasonable participant to believe that out-of-network services would be paid out at higher rates that are not tied to Medicare.

88.   Both network coverage and payment rates are material to beneficiaries because they affect the convenience and the financial burden of obtaining care. They also affect whether beneficiaries will remain on the plan *at all*, given that they face substantial liability to out-of-network providers for the difference between the Plan's

S T R I S
M A H E R

725 S. FIGUEROA ST. STE 1830
LOS ANGELES, CA 90017

payout rate and the provider's billed charges. Failing to properly disclose such information accordingly violates ERISA's disclosure requirements.

89.    ERISA entitles misled beneficiaries and their assignees to recover under theories of surcharge, reformation, and estoppel.

a.    Surcharge is a remedy that holds a fiduciary accountable for a breach that injures a beneficiary. Here, the Plan's failure to explain to beneficiaries that treatment at DaVita would be paid at a lower rate than other covered services injured beneficiaries by imposing a larger financial obligation upon them and injured DaVita by under-compensating it for provided care. Because DaVita is being treated as an out-of-network provider, the Plan should be surcharged the difference between what it actually paid and DaVita's usual, customary, and reasonable (UCR) charges.

b.    Reformation reforms an instrument to accord with the understanding of the misled party. Here, as explained above, the beneficiaries were misled about payout rates (and patients' corresponding financial obligations). The Plan should be reformed to require it to compensate dialysis providers like DaVita at their usual, customary, and reasonable (UCR) rates.

c.    Estoppel holds a defendant to its word when it would be unjust to do otherwise. Here, the Plan misled beneficiaries about the payment rates for out of network dialysis care. Both the beneficiaries and DaVita relied on the Plan's representations and omissions and were injured as a result of the Plan's refusal to pay DaVita its usual and customary charges. And the Plan's behavior is here particularly egregious, coupled as it is with the elimination of a genuine in-network option and discriminatory animus toward people with ESRD. The Plan should be estopped from paying DaVita anything lower than its usual and customary charges.

90.    Plaintiffs are entitled to relief under 29 U.S.C. § 1132(a)(3), as well as attorneys' fees under 29 U.S.C. § 1132(g).

## COUNT FIVE

### Against All Defendants

(Negligent Misrepresentation, Promissory Estoppel, and

Quantum Meruit Under State Law)

91.    DaVita re-alleges each paragraph of this Complaint as if fully set forth herein.

92.    The Plan and its agents misled DaVita about the payments they could expect for rendering services. DaVita's staff contacted Plan representatives before treating beneficiaries of the Amy's Plan. In the past, DaVita was paid no worse than in-network rates, and during the course of its interactions with Plan representatives, DaVita was initially led to believe that that level of payment would continue. DaVita subsequently learned that it would be treated as an out-of-network provider, but it was never informed that it would be reimbursed at a Medicare-based rate.

93.    DaVita understandably and mistakenly believed that it would be appropriately paid for its services, and it reasonably relied on this belief to its detriment by, *inter alia*, providing care for which it has not been fully compensated.

94.    These facts warrant relief under state law theories of negligent misrepresentation, promissory estoppel, and quantum meruit.

95.    Relief for negligent misrepresentation is available under state law when there is (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) justifiable reliance by Plaintiff; and (3) resulting damages. All occurred here. DaVita is therefore entitled to in-network or its usual and customary rates.

96.    Promissory estoppel relief is available under state law when there is (1) a promise to pay for services rendered; (2) foreseeable and justifiable reliance by the Plaintiff; and (3) resulting damages. All occurred here. The Plan should therefore be estopped from paying DaVita anything less than in-network charges as the Plan led it to believe it would receive.

97.     Finally, the quantum meruit remedy permits a party to recover the reasonable value of services rendered based on an implied promise to pay. It is available under state law where the conduct of the parties allows the dual inferences that one performed at the other's request and that the requesting party promised to pay. That is precisely what happened here. DaVita is therefore entitled to reasonable value, i.e., its usual and customary and reasonable charges for its services.

98.     DaVita—in its own right as a provider—accordingly seeks relief under state law theories of negligent misrepresentation, promissory estoppel, and quantum meruit.

### PRAYER FOR RELIEF

WHEREFORE, DaVita prays for judgment against Defendants as follows:

1.     For equitable relief and monetary relief, in an amount to be proven at trial, including double damages under the MSPA, plus all applicable interest and costs;

2.     For all attorneys' fees and costs incurred in bringing this action, to the extent recoverable by law;

3.     For an order declaring DaVita's rights and enjoining Defendants from continuing their illegal practices; and

4.     For all other relief the Court deems appropriate, proper, and just.

Respectfully submitted,

Dated: November 16, 2018          **STRIS & MAHER LLP**

/s/ Brendan S. Maher
Peter K. Stris
Brendan S. Maher
Michael Donofrio
Rachana A. Pathak

Attorneys for Plaintiffs DAVITA INC. and STAR DIALYSIS, LLC

STRIS MAHER | 725 S. FIGUEROA ST. STE 1830 | LOS ANGELES, CA 90017