**STRIS & MAHER LLP**
PETER K. STRIS
  peter.stris@strismaher.com
BRENDAN S. MAHER
  brendan.maher@strismaher.com
MICHAEL DONOFRIO *(pro hac vice)*
  michael.donofrio@strismaher.com
RACHANA A. PATHAK
  radha.pathak@strismaher.com
725 South Figueroa Street, Suite 1830
Los Angeles, CA 90017
T: (213) 995-6800 | F: (213) 261-0299

Attorneys for Plaintiffs DAVITA INC. and
STAR DIALYSIS, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVITA INC. and STAR DIALYSIS, LLC, | Case No. 3:18-cv-06975-JST |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| AMY'S KITCHEN, INC. EMPLOYEE BENEFIT HEALTH PLAN and AMY'S KITCHEN, INC, | Date: March 28, 2019<br>Time: 2:00 p.m.<br>Courtroom: 9 |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

LEGAL STANDARD...........................................................................................................2

FACTUAL BACKGROUND .................................................................................................2

STATEMENT OF THE ISSUES ...........................................................................................4

ARGUMENT .......................................................................................................................4

    I.      DaVita Has Standing To Pursue All Of Its Claims....................................4

           A.      DaVita's assignment encompasses suits for fiduciary
                 breach under ERISA .............................................................5

           B.      DaVita may pursue its ERISA and MSPA claims as
                 Patient 1's assignee because Patient 1 has suffered an
                 injury-in-fact under Article III ................................................7

    II.     DaVita Has Stated A Claim For Violation Of The MSPA .........................9

           A.      DaVita has plausibly alleged that Amy's violated the
                 MSPA's substantive prohibitions ........................................10

           B.      DaVita may seek redress for Amy's MSPA violation
                 either via ERISA or via the MSPA's private right of action ..........14

                 1.      Provisions of an ERISA plan that violate federal
                       law are void..........................................................14

                 2.      DaVita also may seek redress for Amy's MSPA violation via the
                       MSPA's private right of action ...........................15

    III.    DaVita Has Stated A Benefits Claim And A Fiduciary Breach
          Claim Under ERISA ...............................................................19

            A.      DaVita has stated a claim for benefits under 29 U.S.C.
                 § 1132(a)(1)(B) ...................................................................20

           B.      DaVita has stated a fiduciary breach claim under
                 29 U.S.C. § 1132(a)(3)........................................................22

    IV.    DaVita Has Stated Claims Under State Law ..........................24

CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Pac. Ents.*,
   950 F.2d 611 (9th Cir. 1991) ...................................................................................22

*Amara v. CIGNA Corp.*,
   775 F.3d 519 (2d Cir. 2014) ....................................................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................................2

*In re Avandia*,
   685 F.3d 353 (3d Cir. 2012) ....................................................................................18

*Bio-Medical Applications of Tenn. v. Cent. Sts. Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277 (6th Cir. 2011) .......................................................... *passim*

*Care First Surgical Ctr. v. ILWU-PMA Welfare Plan*,
   No. CV 14-1480, 2014 WL 12573014 (C.D. Cal. Dec. 26, 2014) ...............6, 11, 19, 24

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000) ................................................................................................16

*CIGNA v. Amara*,
   563 U.S. 421 (2011) ................................................................................................23

*Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58 (1st Cir. 2013) ........................................................22

*Conkright v. Frommert*,
   559 U.S. 506 (2010) ................................................................................................21

*Curtis v. Nev. Bonding Corp.*,
   53 F.3d 1023 (9th Cir. 1995) ...................................................................................25

*Frazer v. CNA Ins. Co.*,
   374 F. Supp. 2d 1067 (N.D. Ala. 2005) ....................................................................8

*Gabriel v. Alaska Elec. Pension Fund*,
   773 F.3d 945 (9th Cir. 2014) ...................................................................................24

*Longest v. Green Tree Servicing LLC*,
   74 F. Supp. 3d 1289 (C.D. Cal. 2015) ......................................................................6

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ..............................................................................7, 8

*Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*,
   No. 14 Civ. 2495, 2016 WL 4382709 (S.D.N.Y. Aug. 16, 2016) ................................6

*Mich. Spine & Brain Surgeons v. State Farm*,
   758 F.3d 787 (6th Cir. 2014) .....................................................................................7

ii

*Misic v. Building Serv. Emps. Health & Welfare Tr.*,
   789 F.2d 1374 (9th Cir. 1985) .................................................................................5

*Nat'l Renal Alliance, LLC v. Blue Cross & Blue Shield of Ga., Inc.*,
   598 F. Supp. 2d 1344 (N.D. Ga. 2009) ...........................................................11, 13, 14

*Netro v. Greater Balt. Med. Ctr., Inc.*,
   891 F.3d 522 (4th Cir. 2018) .................................................................................1

*Parra v. PacifiCare of Ariz.*,
   715 F.3d 1146 (9th Cir. 2013) ...............................................................................16

*Pinnacle Armor, Inc. v. United States*,
   648 F.3d 708 (9th Cir. 2011) .................................................................................2

*SEC v. Capital Gains Research Bureau, Inc.*,
   375 U.S. 180 (1963) ...........................................................................................24

*Sgro v. Danone Waters of N. Am.*,
   532 F.3d 940 (9th Cir. 2008) .................................................................................2

*Shah v. Horizon Blue Cross Blue Shield*,
   No. 15 Civ. 8590, 2016 WL 4499551 (D.N.J. Aug. 25, 2016) .........................................6

*Silva v. DiVittorio*,
   658 F. 3d 1090 (9th Cir. 2011) ...............................................................................2

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ...........................................................................................16

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
   770 F.3d 1282 (9th Cir. 2014) .........................................................................6, 7, 8, 9

*Tapley v. Locals 302 & 612 of Int'l Union of Operating Engineers-Emps. Const.*
   *Indust. Ret. Plan*, 728 F.3d 1134 (9th Cir. 2013)..................................................21, 22

*Townsend v. Thomson Reuters Grp. Disability Income Ins. Plan*,
   807 F. Supp. 2d 924 (C.D. Cal. 2011) .......................................................................20

*Woods v. Empire Health*,
   574 F.3d 92 (2d Cir. 2009)....................................................................................18

**Statutes**

29 U.S.C. § 1022 ..................................................................................................22

29 U.S.C. § 1104 ..................................................................................................22

29 U.S.C. § 1132(a)(1)(B) ...............................................................................15, 19, 20, 21

29 U.S.C. § 1132(a)(3)....................................................................................15, 19, 20, 22

29 U.S.C. § 1182 ..................................................................................................14

42 U.S.C. § 1395c ............................................................................................10, 12

iii

42 U.S.C. § 1395y(b)(1) ................................................................................10, 19

42 U.S.C. § 1395y(b)(2) ....................................................................................17, 18

42 U.S.C. § 1395y(b)(3) ....................................................................................15, 17, 18

**Other Authorities**

29 C.F.R. § 2560.503-1 .........................................................................................7

29 C.F.R. § 2590.702 ...........................................................................................14

42 C.F.R. § 411.108 .............................................................................................11

42 C.F.R § 411.161 ..............................................................................................11

60 Fed. Reg. 45344-01 (Aug. 31, 1995) ..........................................................11, 12

Centers for Medicare & Medicaid Services, Medicare Secondary Payer Manual ..........................7, 16

Fed. R. Civ. P. 12(b)(1)........................................................................................2

Fed. R. Civ. P. 12(b)(6)........................................................................................2

3 John N. Pomeroy, *A Treatise on Equity Jurisprudence* (5th ed. 1941) ...........................................24

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-06975-JST

**INTRODUCTION**

Despite packing more than 20 distinct arguments into their motion to dismiss, Defendants (Amy's Kitchen, Inc. and its health plan, collectively "Amy's") fail to meaningfully engage the core of DaVita's Complaint. Amy's completely eliminated network coverage and drastically reduced patient reimbursement for dialysis and no other medical treatment. These actions violate the Medicare Secondary Payer Act (MSPA), a law that Congress enacted for the very purpose of preventing the type of cuts that Amy's imposed here. And because Amy's made these cuts without clearly disclosing them, Amy's has violated the Employee Retirement Income Security Act of 1974 (ERISA) as well.

The MSPA is an important federal statute that protects patients with end-stage renal disease (ESRD), their medical providers, and the federal fisc. Before the MSPA was enacted, Medicare bore the full cost of treating ESRD. *Bio-Medical Applications of Tenn. v. Cent. Sts. Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 278 (6th Cir. 2011). "The MSP[A] inverted that system." *Netro v. Greater Balt. Med. Ctr., Inc.*, 891 F.3d 522, 524 (4th Cir. 2018). It made "private insurers . . . the 'primary' payers and Medicare the 'secondary' payer" during an individual's first 30 months of ESRD-based Medicare eligibility. *Bio-Medical Applications*, 656 F.3d at 278. "[T]he precise problem that Congress sought to ameliorate was that private plans would provide inferior benefits or coverage for medical treatment that also was covered by Medicare." *Id.* at 281. That is what Amy's has done here. It eliminated network coverage and slashed reimbursement for dialysis alone—the one treatment that is almost always covered by Medicare (and that ESRD patients need to survive).

As a result, Amy's has placed its beneficiaries with ESRD in jeopardy. These patients no longer have access to in-network treatment—meaning they face financial responsibility for all amounts Amy's refuses to pay. And given Amy's dramatic reduction in reimbursement amounts, those financial burdens are insurmountable for typical ESRD patients. To make matters worse, the language of the Amy's Plan does not authorize this conduct or give beneficiaries clear notice of the cuts. Amy's has thus violated the MSPA, ERISA, and state law.

Amy's all but ignores these central allegations, instead attempting to spin an entirely different factual narrative. Amy's contends it merely enacted a routine cost-control measure designed to "protect" itself from charges it thinks are "unreasonable." Motion to Dismiss (Mot.) 1. But arguing

1

1    that the facts are not as the Complaint alleges only underscores why this case cannot be resolved on

2    the pleadings. DaVita plausibly alleges that the dialysis carve-out is an illegal attempt to avoid the

3    payment responsibility imposed by the MSPA. Amy's argues the carve-out is motivated by other

4    concerns. While Amy's will certainly be entitled to its side of the story, it cannot prevail on a motion

5    to dismiss simply by denying the Complaint's allegations.

6                                            **LEGAL STANDARD**

7          Amy's moves to dismiss DaVita's claims under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). To avoid

8    dismissal under Federal Rule of Civil Procedure 12(b)(6), a plaintiff simply has to "allege 'sufficient

9    factual matter . . . to state a claim to relief that is plausible on its face.'" *Pinnacle Armor, Inc. v. United*

10   *States*, 648 F.3d 708, 721 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). A claim

11   has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the

12   reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

13   A court must accept the well-pleaded factual allegations of the complaint as true, construe them in the

14   light most favorable to plaintiffs, and draw all reasonable inferences in favor of plaintiffs. *Pinnacle*,

15   648 F.3d at 721. "[A] district court should grant leave to amend even if no request to amend . . . was

16   made," unless amendment is futile. *Silva v. DiVittorio*, 658 F.3d 1090, 1105 (9th Cir. 2011).

17                                         **FACTUAL BACKGROUND**

18         DaVita provides life-sustaining care to patients, including Amy's Plan beneficiaries, suffering

19   from ESRD.[1] Complaint, ECF No. 1, ¶¶ 1, 24-26 (hereinafter "Compl."). The Amy's Plan leads

20   beneficiaries to believe that both in-network and out-of-network dialysis treatments are covered. *See*

21   ECF No. 25-2, Ex. A to Declaration of Carme Lewis, Amy's Kitchen, Inc. Employee Benefit Health

22   Plan (hereinafter "Plan").[2] It says that participants may seek treatment from either "preferred" (in-

23

24   ─────────────────────
     [1] Star Dialysis, LLC and DaVita Inc. will be referred to herein collectively as "DaVita." Defendant
25   Amy's Kitchen, Inc. is the sponsor and plan administrator of the Amy's Kitchen Employee Benefit
     Health Plan. Amy's Kitchen, Inc. is a fiduciary of the Amy's Plan.

26   [2] An ERISA plan may be incorporated by reference and properly considered on such a motion to
     dismiss. *Sgro v. Danone Waters of North America*, 532 F.3d 940, 942 n.1 (9th Cir. 2008). However,
27   incorporation by reference does not permit the Court to make factual determinations, *id.*, and DaVita
     does not consent to having Defendants' motion treated as one under Rule 56. If Exhibit A to the
28   Declaration of Carme Lewis is not incorporated by reference, it should not be considered.

network) or "nonpreferred" (out-of-network) providers. Plan at 17. If participants seek treatment from a nonpreferred provider, they are "responsible for the remaining balance" that the Plan does not pay— what is known as balance billing. *Id.* But if, on the other hand, participants seek treatment from a preferred provider, the Plan says they will be protected from balance billing, because such providers have agreed to accept the Plan's negotiated reimbursement amounts as "payment in full." *Id.* at 17, 118, 120. Under these rules, Plan beneficiaries long received in-network coverage for DaVita's services, for which DaVita was paid negotiated rates. *See* Compl. ¶¶ 30, 32-36.

Beginning January 1, 2017, however, Amy's adopted a new approach. *Id.* ¶ 40. As of that date, the Plan was amended to subject all dialysis-related claims to "mandated cost review." *Id.* ¶ 41. While the Plan describes this dialysis carve-out simply as a new reimbursement methodology for dialysis providers, in reality, the new program eliminated all network coverage for dialysis treatment. *Id.*; Plan at 36-37. The Plan, however, gives participants no warning that they will lose access to the protections that come with seeking treatment from a preferred provider. *Id.* Meanwhile Plan beneficiaries requiring other treatments continue to enjoy access to robust provider networks. Compl. ¶ 46.

Amy's actions place ESRD patients in serious jeopardy. When a patient receives treatment from an out-of-network provider, the patient faces financial responsibility for all amounts that the Plan does not pay. *Id.* ¶¶ 45, 67-68. That is why access to in-network treatment is critical: patients face no residual financial responsibility. *Id.* Yet out-of-network providers are now the only option for Amy's beneficiaries with ESRD. That means those beneficiaries alone face a "choice": stop receiving treatment altogether (and die), or continue receiving treatment and stare down insurmountable medical bills. *Id.* The only other option is leaving the Plan for Medicare, where balance billing is not permitted. But that option is the very problem that Congress enacted the MSPA to address.[3]

To make matters still worse for its ESRD beneficiaries, Amy's coupled its network elimination with a drastic reduction in reimbursement amounts for dialysis alone—pushing patients' residual financial responsibility even higher. As of January 1, 2017, Amy's tied its new reimbursement rate to the Medicare fee schedule, even though the Medicare fee schedule is not among the factors the Plan

---

[3] Although a patient could in theory enroll in Medicare and remain on the Amy's Plan, such a patient would have to pay *both* Medicare premiums and Amy's Plan premiums—an unattractive alternative.

1    permits the administrator to consider in determining reimbursement amounts. *Id.* ¶¶ 26, 50-52; Plan at

2    36-37. Just as Amy's eliminated network coverage only for dialysis, it applied this new, Medicare-

3    based rate only to out-of-network dialysis services. Compl. ¶ 52.

4         Against this backdrop, DaVita has provided life-sustaining care to at least one Amy's Plan

5    beneficiary, who executed a valid assignment to DaVita. *Id.* ¶ 56. DaVita followed standard intake

6    and treatment procedures, including contacting Amy's Plan representatives to verify coverage and

7    obtain authorization to provide treatment. Through these interactions, and based on past practice,

8    Amy's led DaVita to believe it would continue to receive the negotiated rate for its services. *Id.* ¶¶ 92-

9    93. And even after it became clear that DaVita was being treated as an out-of-network provider, Amy's

10   never informed DaVita that it would base its reimbursement amounts on the Medicare fee schedule.

11   *Id.* That, however, is exactly what Amy's did. *Id.* ¶¶ 56(g), 63(b), 92-93.

12        DaVita administratively appealed Amy's decisions with respect to the services provided to

13   Patient 1. Amy's denied the appeal and told DaVita it was entitled to sue under ERISA. *Id.* ¶ 56(h).

14   **STATEMENT OF THE ISSUES**

15      1.  Whether DaVita has standing to pursue its ERISA and MSPA claims as Patient 1's assignee.

16      2.  Whether DaVita (a) has stated a claim for violation of the MSPA, and (b) has a cause of action

17          through which to pursue Amy's violation of the MSPA.

18      3.  Whether DaVita has stated claims for benefits and breach of fiduciary duty under ERISA.

19      4.  Whether DaVita has stated claims under state law for negligent misrepresentation, quantum

20          meruit, and promissory estoppel.

21   **ARGUMENT**

22        DaVita first addresses Amy's standing challenges and then explains why DaVita has stated

23   claims under the MSPA, ERISA, and state law. Across the board, Amy's arguments are either contrary

24   to law or refuse to accept the Complaint's allegations as true. Amy's motion should be denied.

25   **I.    DaVita Has Standing To Pursue All Of Its Claims.**

26        DaVita has standing to pursue each of its claims. It may sue in its own right under the MSPA

27   and state law. And it may pursue ERISA and MSPA claims as Patient 1's assignee. Amy's does not

28   dispute DaVita's standing to sue directly under the MSPA or state law. It does, however, incorrectly

1  challenge DaVita's standing to sue as Patient 1's assignee, in two relatively narrow respects.[4]

2  First, Amy's contends that DaVita's assignment from Patient 1 does not transfer the right to

3  bring an ERISA fiduciary breach claim. Mot. 8-10. That is incorrect. DaVita's assignment

4  encompasses not only the right to receive benefit payments, but also the right to pursue "any cause of

5  action" under ERISA. ECF No. 25-3, Lewis Dec. Ex. B at 3 (hereinafter "Assignment"). That includes

6  a cause of action for fiduciary breach.

7  Second, Amy's argues that Patient 1 (in whose shoes DaVita stands) suffered no Article III

8  injury-in-fact with respect to the ERISA benefits and MSPA claims because, *inter alia*, DaVita has

9  not sought reimbursement from Patient 1 for amounts the Plan has refused to pay. Amy's is again

10  incorrect. Patient 1 suffered a straightforward economic injury from Amy's network elimination and

11  reimbursement reduction, and the Ninth Circuit has squarely held that a provider's decision not to

12  pursue reimbursement from a patient does nothing to rob the patient of Article III injury.

13  **A.      DaVita's assignment encompasses suits for fiduciary breach under ERISA.**

14  It is well-settled that participants and beneficiaries in welfare plans may assign their ERISA

15  claims to medical providers. *Misic v. Building Serv. Emps. Health & Welfare Tr.*, 789 F.2d 1374,

16  1377-78 (9th Cir. 1985). Here, in connection with receiving dialysis treatment, Patient 1 executed an

17  assignment of his rights to DaVita. *See* Compl. ¶ 56(d). Amy's does not dispute that DaVita holds a

18  valid assignment of Patient 1's ERISA benefits claim. It argues, however, that DaVita's assignment

19  does not cover claims "for breach of fiduciary duty and for equitable relief under ERISA." Mot. 9.

20  Amy's misconstrues the scope of DaVita's assignment. The assignment does not transfer only

21  the right to payment, as Amy's asserts. Instead, DaVita's assignment expressly encompasses "any

22  cause of action *and/or* any payment due to me (or my estate) under any employee benefit plan."

23  Assignment at 3 (emphasis added). As the Complaint explains, this language both "gives DaVita the

24  right to be paid directly for any services rendered," and "*also* entitles DaVita to assert [each patient's]

25  legal rights under ERISA and other applicable law." Compl. ¶ 56 (d) (emphasis added). "These legal

26  rights include the right to recover benefits . . . *and* to bring suit for violations of ERISA and other

27

28  _____
[4] DaVita pursues its MSPA claim both in its own right and as assignee. Compl. ¶ 73.

applicable law." *Id.* (emphasis added). Courts regularly recognize that assignments like DaVita's transfer the right both to recover benefits and to bring other ERISA-based claims. *See, e.g.*, *Care First Surgical Ctr. v. ILWU-PMA Welfare Plan*, No. CV 14-1480, 2014 WL 12573014, at *8 (C.D. Cal. Dec. 26, 2014) (assignment of "the right to bring claims under the civil enforcement provisions of ERISA" transferred fiduciary breach claims under *Spinedex*); *Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*, No. 14 Civ. 2495, 2016 WL 4382709, at *5 (S.D.N.Y. Aug. 16, 2016) (assignment of "any claim, right, or cause in action including litigation against my health plan" together with "all rights and obligations" under the plan encompassed fiduciary breach claims); *Shah v. Horizon Blue Cross Blue Shield*, No. 15 Civ. 8590, 2016 WL 4499551, at *8 (D.N.J. Aug. 25, 2016) (similar) (collecting cases).

The assignment's express reference to "any cause of action" *in addition to* "any payment" (Assignment at 3) makes it fundamentally different from the assignment language Amy's cites in its motion. Mot. 9. There, the assignment form stated "[t]his is a direct assignment of my rights and benefits under this policy." *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1292 (9th Cir. 2014). In context, the court did not think that the word "rights" was intended to sweep any more broadly than a right to receive payment. *Id.* Here, by contrast, the assignment expressly and specifically includes "any cause of action . . . under any employee benefit plan." Assignment at 3. And Amy's cannot dispute that a cause of action for breach of fiduciary duty is among the causes of action available to the participant under the Plan.

Thus, it simply is not the case here that "[t]he Assignment nowhere indicates that, by executing the assignment, patients were assigning . . . rights to bring claims for breach of fiduciary duty." *Spinedex*, 770 F.3d at 1292. Patient 1 knowingly and intentionally assigned *both* the right to payment and (separately) *any* cause of action under the plan. DaVita's right to bring a "cause of action" is synonymous with a right to bring a "claim" as contemplated by *Spinedex. See id.*; *Care First Surgical Ctr.*, 2014 WL 12573014, at *9; *Mbody*, 2016 WL 4382709, at *5; *Shah*, 2016 WL 4499551, at *8.[5]

---

[5] At bare minimum, the assignment is ambiguous, and a court may not resolve ambiguous contractual language on a motion to dismiss. *See, e.g.*, *Longest v. Green Tree Servicing LLC*, 74 F. Supp. 3d 1289, 1297 (C.D. Cal. 2015).

**B.      DaVita may pursue its ERISA and MSPA claims as Patient 1's assignee because Patient 1 has suffered an injury-in-fact under Article III.**

There is no basis for Amy's position that, with respect to the ERISA benefits and MSPA claims, Patient 1 has not suffered an "injury in fact" under Article III and so has no claim to assign to DaVita. Patient 1 suffered an economic injury that satisfies Article III from the Plan's improper network elimination and reimbursement reduction. That does not change simply because Patient 1 assigned his resulting ERISA and MSPA claims to DaVita, and DaVita has not yet collected from Patient 1 the amounts the Plan has wrongfully refused to pay. DaVita may therefore pursue its ERISA and MSPA claims as Patient 1's assignee.[6]

1. A denial of benefits confers Article III standing to pursue a benefits claim because it results in a straightforward economic injury to the beneficiary. *See Spinedex*, 770 F.3d at 1291 ("No one . . . would contend that the beneficiaries would have lacked Article III standing [to pursue a claim for unpaid benefits under the terms of the plan]."); *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011) ("Economic injury is clearly a sufficient basis for standing.").

And a denial of ERISA benefits is precisely what the Complaint alleges here. *See infra* 20-22. The Amy's Plan still purports to offer patients access to dialysis treatment from "preferred providers" who will not balance bill them, and it purports to reimburse dialysis treatment for out-of-network providers at a non-Medicare based rate. *See id.*; Plan at 17, 36, 118. But in fact, Amy's did *not* offer ESRD patients access to in-network dialysis treatment, and it reimbursed Patient 1's treatment at a rate improperly tied to the Medicare fee schedule.

In other words, the Complaint alleges that the Plan entitles Patient 1 to better coverage and higher reimbursement than he actually received. *See* 29 C.F.R. § 2560.503-1(m)(4) (defining "adverse benefit determination" as including a "denial, reduction, or termination of, or a failure to provide or

---

[6] Amy's does not dispute the validity of DaVita's assignment with respect to the ERISA benefits and MSPA claims. Mot. 10-12. Moreover, Amy's acknowledges that DaVita also pursues its MSPA claim in its own right, and it does not challenge DaVita's standing to do so (nor could it). Mot. 11; *see Mich. Spine & Brain Surgeons v. State Farm*, 758 F.3d 787, 790 (6th Cir. 2014) ("Providers of medical care can sue primary plans who fail to pay under the" MSPA.); Centers for Medicare & Medicaid Services, Medicare Secondary Payer Manual, Ch. 1 § 30.B (hereinafter "MSPA Manual") (proper MSPA "claimants" include a "provider"), www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019017.html.

7

1    make payment (in whole or in part)" for a claimed benefit). And the Plan itself says that when a patient

2    must seek out-of-network treatment, it "results in greater out-of-pocket expenses to the covered

3    person." Plan at 17. Patient 1 accordingly suffered a straightforward economic injury from Amy's

4    conduct. While Amy's may dispute these allegations on the merits, it has no basis to argue that they

5    do not satisfy the requirements for Article III standing. *Maya*, 658 F.3d at 1069.

6         2. Equally groundless is Amy's argument that Patient 1 suffered no Article III injury-in-fact

7    because DaVita has not yet collected from Patient 1 the amounts the Plan wrongfully refused to pay.

8    Patient 1 suffered harm from the Plan's network elimination and reimbursement reduction; he validly

9    assigned his resulting ERISA benefits and MSPA claims to DaVita; and DaVita's decision whether or

10   not to pursue reimbursement from Patient 1 has no bearing whatsoever on his Article III standing.

11        Indeed, the Ninth Circuit has squarely rejected the argument "that because [a provider] has not

12   sought payment from its assigning patients for any shortfall, those patients do not have the 'injury in

13   fact' necessary for Article III standing." *Spinedex*, 770 F.3d at 1289. In *Spinedex*, patients of a physical

14   therapy clinic assigned the clinic their right to reimbursement from their health plans. *Id.* at 1287-88.

15   They also signed forms acknowledging personal responsibility for amounts their plans did not pay. *Id.*

16   After the plans refused to pay the clinic's charges "in whole or in part," the clinic sued the plans

17   without also seeking reimbursement from the patients themselves. *Id.* at 1288. The plans argued that

18   the clinic's decision not to collect from the patients robbed those patients (and, in turn, the clinic) of

19   Article III standing. *Id.* at 1291.

20        The Ninth Circuit dismissed the plans' argument out of hand. It held that "[t]he fact that

21   Spinedex [the clinic] has chosen not to seek payment from its assignors, despite its contractual right

22   to do so, does not mean that Spinedex had no right to recover benefits under the Plans from Defendants.

23   It means only that Spinedex has decided not to pursue its legal rights against its assignors." *Id.* The

24   exact same thing is true here.

25        Amy's does not cite any authority to the contrary. Unlike *Spinedex* (controlling authority that

26   Amy's does not cite in connection with this issue), not a single one of Amy's cases involved an

27   assignor-assignee relationship. *See* Mot. 11. Thus, while it may be true that "inchoate future medical

28   expense[s]" are not enough to establish standing, *Frazer v. CNA Ins. Co.*, 374 F. Supp. 2d 1067, 1078-

8

79 (N.D. Ala. 2005), that is not what happened here. Patient 1 suffered a straightforward economic injury when the Plan eliminated network coverage and refused to fully reimburse his dialysis treatment, in violation of ERISA and the MSPA. He assigned his claims to DaVita. And, as *Spinedex* holds, DaVita's choice not to *also* pursue a claim against Patient 1 does not rob Patient 1 of standing. DaVita accordingly may pursue its ERISA and MSPA claims as Patient 1's assignee.[7]

In sum, DaVita has standing to pursue each of its claims, and Amy's threshold challenge fails across the board. As explained next, Amy's fares no better on the merits.

## II.   DaVita Has Stated A Claim For Violation Of The MSPA.

This Court's analysis of DaVita's MSPA claim turns on two distinct questions, which Amy's tries to conflate: <u>first</u>, whether the Complaint plausibly alleges that Amy's violated the MSPA's *substantive* commands, and <u>second</u>, if so, whether DaVita has a *private cause of action* through which to seek redress for that violation. The answer to both questions is yes.

First, DaVita has plausibly alleged that Amy's violated the MSPA by eliminating network coverage and slashing reimbursement rates for dialysis but not other medical treatments. This conduct violates the MSPA in two distinct ways: (1) it impermissibly "takes into account" Medicare eligibility (of individuals with ESRD) and (2) it "differentiates" in the benefits provided to individuals with ESRD and those without.

Second, Amy's violations can be remedied under both ERISA's prohibition on plan terms that violate federal law and the MSPA's private right of action. Although the Sixth Circuit in *Bio-Medical Applications* held that the MSPA's private right of action is available only where Medicare itself is "out of pocket," this Court should hold otherwise. The Sixth Circuit's analysis is inconsistent with the statute's text, Ninth Circuit law, and the interpretation of the expert agency tasked with implementing

---

[7] *Spinedex*'s reasoning applies with equal force to both the ERISA claims and the MSPA claim. *Spinedex* addresses whether an assignee's (DaVita's) decision not to pursue reimbursement from an assignor (Patient 1) eviscerates the assignor's (Patient 1's) Article III standing. That is a constitutional question antecedent to any statutory inquiry. Indeed, Amy's itself argues the Article III inquiry is the same for both claims. Mot. 12. And *Spinedex* plainly holds that the assignor (Patient 1) does not lose Article III standing simply because the assignee (DaVita) declines to seek money. That is dispositive both as to the ERISA claims and the MSPA claim. And in any event, as noted, Amy's does not challenge DaVita's standing to sue under the MSPA in its own right.

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-06975-JST

1  the MSPA. But even if this Court adopts the Sixth Circuit's construction of the MSPA's right of action,

2  that is not the end of the matter. As *Bio-Medical Applications* itself explains, ERISA prohibits plan

3  terms that violate federal law such as the MSPA. Consequently, a plan term that violates the MSPA

4  gives rise to a claim under ERISA, where payment by Medicare is entirely irrelevant.[8]

5      **A.**   **DaVita has plausibly alleged that Amy's violated the MSPA's substantive**

6           **prohibitions.**

7      Individuals with ESRD are entitled to Medicare regardless of age or other disability. *See* 42

8  U.S.C. § 1395c. For many years, this led private insurers to shift the cost of treating ESRD to

9  Medicare—meaning that the federal fisc bore virtually the entire weight of treating ESRD. *See Bio-*

10 *Medical Applications*, 656 F.3d at 281. Congress enacted the MSPA to invert this status quo, making

11 "private insurers . . . the 'primary' payers and Medicare the 'secondary' payer" during an individual's

12 first 30 months of ESRD-based Medicare eligibility. *Id.* at 278. "[T]he precise problem that Congress

13 sought to ameliorate was that private plans would provide inferior benefits or coverage for medical

14 treatment that also was covered by Medicare." *Id.* at 281.

15     The MSPA accomplishes this goal by broadly prohibiting two types of conduct by health plans:

16 (1) "tak[ing] into account" ESRD-based Medicare eligibility and (2) "differentiat[ing] in the benefits"

17 offered to individuals with ESRD as compared to those without. 42 U.S.C. § 1395y(b)(1)(C). Although

18 they overlap, these provisions establish two distinct violations. The "take-into-account" provision

19 principally serves the MSPA's goal of preventing health plans from providing inferior coverage for

20 treatment also covered by Medicare, and it bars plans (regardless of how they treat anyone else on the

21 plan) from "*consider[ing]* the fact that an insured person is also covered by Medicare" in setting

22 benefits. *Bio-Medical Applications*, 656 F.3d at 282. The anti-differentiation provision, on the other

23 hand, carries out the Act's other key aim of preventing discrimination against ESRD individuals. *See*

24

25 [8] Amy's argument that Medicare must be "out of pocket" (Mot. 12-13) thus goes not to whether DaVita
   states a *substantive* MSPA claim, but to the availability of the MSPA's *private right of action*. *Bio-*
26 *Medical Applications* illustrates the distinction. The court first addressed the substantive violation and
   held it was remediable under ERISA, all without reference to whether Medicare had made any
27 payment. *Bio-Medical Applications*, 656 F.3d at 281-84. Payment by Medicare was relevant *only* to
   the availability of the MSPA's private right of action. *See id.* at 284-87.

28

1  *Nat'l Renal Alliance, LLC v. Blue Cross & Blue Shield of Ga., Inc.*, 598 F. Supp. 2d 1344, 1352 (N.D.

2  Ga. 2009) (discussing the statute's "non-discrimination" goals).[9]

3      Here, Amy's argues it does not violate these prohibitions because (1) there is "no disparity of

4  treatment between ESRD patients . . . and non-Medicare eligible dialysis patients," and (2) it has

5  simply implemented "cost-containment measure[s] contemplated by the MSPA." Mot. 14-15. As

6  explained below (13-14), the dialysis carve-out in fact does uniquely target ESRD patients for special

7  and worse treatment. And regardless, the MSPA does more than prohibit differential treatment. It also

8  prohibits plans from taking into account Medicare eligibility in enacting benefits limitations—a

9  separate issue that Amy's motion almost entirely ignores.

10      ***Take into account.*** Amy's network elimination and reimbursement reduction violate the

11  MSPA's take-into-account provision. Although the MSPA does not *categorically* prohibit cost-control

12  measures, it *does* forbid plans from "provid[ing] inferior benefits or coverage for medical treatment

13  that [is] also covered by Medicare." *Bio-Medical Applications*, 656 F.3d at 281; 42 C.F.R.

14  § 411.108(a)(5). That is what Amy's has done here. Despite covering numerous expensive treatments

15  besides dialysis, it applied "cost-saving" measures to dialysis alone—the one treatment that Medicare

16  also routinely covers. In so doing, it is beyond plausible that Amy's impermissibly took into account—

17  *i.e.*, "*consider[ed]*"—ESRD patients' Medicare eligibility. *Bio-Medical Applications*, 656 F.3d at 282.

18      That inference can be drawn from the Plan itself, which expressly references payments by

19  *governmental* plans—*i.e.*, Medicare. The Plan specifically states that the administrator "shall *consider*

20  ─────────────────────

21  [9] The regulation governing anti-differentiation claims contains a "like-treatment exception," which says that uniform limitations on dialysis treatment (*i.e.*, limitations that apply equally to ESRD and

22  non-ESRD individuals) "would not be differentiating in the benefits [a plan] provides between plan enrollees who have ESRD and those who do not." 42 C.F.R § 411.161. Thus, although it would not

23  excuse pretextual discrimination against ESRD patients (as DaVita alleges here), this exception may apply to anti-differentiation claims in some circumstances.

24      The like-treatment exception, however, *never* applies to take-into-account claims—as Amy's appears to concede by failing to cite it or argue it applies to such claims. There are several reasons for

25  this. <u>First</u>, take-into-account claims are governed by a different regulation that does not contain a like-treatment exception. 42 C.F.R. § 411.108; *Bio-Medical Applications*, 656 F.3d at 282 (referring to

26  § 411.108 to determine what constitutes taking into account). <u>Second</u>, the take-into-account provision bars even facially neutral "[p]lan provisions that have *the effect* of denying, restricting, or terminating

27  benefits for [ESRD-based Medicare eligible] individuals." 60 Fed. Reg. 45344-01, at *45351 (Aug. 31, 1995) (emphasis added). <u>Third</u>, applying the like-treatment exception to take-into-account claims

28  would allow plans to circumvent the MSPA simply by phrasing their conduct in ostensibly neutral terms. But that is the exact conduct that the MSPA was created to deter.

whether [dialysis] claims reflect potential discrimination against the Plan, by comparison of the charges in such claims against reasonably available data about payments . . . by *governmental . . . plans* for the same . . . goods and services." Plan at 36 (emphasis added). The Plan also says that among the "[r]easons for the Dialysis Program" is the different price that dialysis providers charge "governmental" plans and the fact that the price difference, in Amy's view, serves as a "subsid[y]" for the government. *Id.* In other words, the Plan itself shows that Amy's enacted its dialysis carve-out at least in part because (1) Medicare pays less for dialysis than what DaVita charges Amy's, and (2) Amy's does not wish to subsidize Medicare's dialysis costs.

Nor must the Plan's consideration of Medicare eligibility even be express. Facially neutral "[p]lan provisions that have *the effect* of denying, restricting, or terminating benefits for [ESRD-based Medicare eligible] individuals" violate the take-into-account rule as well. 60 Fed. Reg. 45344-01, at *45351 (Aug. 31, 1995) (emphasis added). As discussed in more detail below (13-14), Amy's dialysis carve-out affects Medicare-eligible ESRD patients in unique and drastically worse ways than non-ESRD patients. Unlike non-ESRD dialysis patients, Medicare-eligible ESRD patients need dialysis at least three time per week for the rest of their lives. Thus, eliminating network protections and cutting reimbursement—leaving patients responsible for unpaid amounts—has devastating effects specifically on the Medicare-eligible segment of the Plan's beneficiaries. The carve-out's concentration of the worst harm specifically on the Plan's Medicare-eligible ESRD patients further bolsters the inference that the Plan illegally took into account those patients' Medicare eligibility.

Common sense confirms this inference. Just as any plan provision carving out insulin treatment would obviously target diabetes patients, the dialysis carve-out is clearly geared toward Medicare-eligible ESRD patients—the only people who need such treatment on an ongoing basis.

Moreover, dialysis is the only treatment the Plan offers that Medicare also covers in almost all cases. *See* 42 U.S.C. § 1395c; Compl. ¶ 23. Were Amy's truly seeking cost-containment without consideration of its participants' Medicare eligibility, one would expect its cost-saving measures to apply to treatments other than the single treatment that Medicare generally speaking also covers. The Plan indeed covers many expensive treatments besides dialysis—chemotherapy, insulin, surgery, even

12

Viagra (*e.g.*, Plan at 29, 41)—yet Amy's did not enact "cost-containment measures" for any of them. The reason is obvious: dialysis is the only one that nearly always has Medicare as a backstop.

Taken together, these observations strongly support an inference that the Plan illegally "*consider[ed]*" its patients' ESRD-based Medicare eligibility in imposing inferior coverage for treatment that is also covered by Medicare. *Bio-Medical Applications*, 656 F.3d at 282. DaVita has accordingly stated a claim under the "take into account" prong of the MSPA.

**Differentiation.** Because DaVita has plausibly alleged that the Plan illegally took into account participants' ESRD-based Medicare eligibility, Amy's argument that the carve-out applies to ESRD and non-ESRD dialysis patients alike (Mot. 14-15) is beside the point. Even so, that argument is wrong—the Complaint directly and plausibly alleges that Amy's conduct has placed its ESRD patients in a uniquely precarious situation. DaVita's differentiation claim therefore also survives dismissal.

ESRD patients—and nobody else on the plan—must receive dialysis at least three times per week indefinitely; otherwise, they will die. Compl. ¶ 20. Yet the Plan's ESRD patients no longer have any in-network options for their treatment. Compl. ¶¶ 41-47. That matters because where a patient receives treatment from an out-of-network provider (now ESRD patients' only option), the patient is liable for all amounts the Plan does not pay. When Amy's reimburses less than DaVita's full billed charges, the patient is responsible for the difference. Compl. ¶ 45. And because Amy's simultaneously slashed its dialysis reimbursement rates to Medicare-based levels, those residual amounts are insurmountable for the typical ESRD patient. Compl. ¶¶ 48-54.

That leaves the Plan's Medicare-eligible ESRD patients with a "choice" that non-ESRD patients will *never* face: (1) stop receiving dialysis treatment altogether and die; (2) stare down insurmountable and ever-growing medical bills; or (3) switch to Medicare, where balance billing is not allowed. Thus, despite Amy's assertions to the contrary, the dialysis carve-out treats ESRD patients far more harshly than it treats non-ESRD patients.

Amy's complete elimination of in-network coverage, moreover, makes this case crucially different from the only authority Amy's cites in support of its "no discrimination" argument—*National Renal Alliance*, 598 F. Supp. 2d 1344. That case did not involve any allegation that the plan had

1    eliminated *all* in-network coverage; rather, the plan had reduced payments to out-of-network providers

2    *while still leaving its system of in-network providers in place. See id.* at 1354.[10]

3           That distinction is all-important. As the court explained: "In the end, . . . this [was] a dispute

4    . . . involving in-network and out-of-network service providers. The person getting the benefit of the

5    dialysis c[ould] still get that service and c[ould] still get that service at a higher reimbursement rate by

6    using an in-network service provider." *Id.* at 1354-55 (emphasis added). It is an entirely different story

7    where, as here, the plan has eliminated all in-network options for *patients themselves*. As explained

8    above and in the Complaint, network elimination places ESRD patients in a far worse position than

9    non-ESRD patients. *National Renal Alliance* accordingly offers Amy's no refuge.

10          In arguing that its dialysis carve-out in fact applies uniformly to all participants regardless of

11   their condition (Mot. 14), Amy's asks this Court to disregard the Complaint's factual allegations. But

12   this Court cannot do that on a motion to dismiss. Amy's will be entitled to present its theory of the

13   case, but it cannot set aside DaVita's allegations at this stage. The parties' warring narratives present

14   a prototypical fact dispute incapable of resolution on the pleadings. Amy's motion must be denied.[11]

15          **B.     DaVita may seek redress for Amy's MSPA violation either via ERISA or via the**

16                   **MSPA's private right of action.**

17          DaVita may remedy Amy's substantive violation in either of two ways: it may sue under

18   ERISA, which prohibits plan terms that violate federal law, or it may proceed directly under the

19   MSPA's private right of action.

20          **1.      Provisions of an ERISA plan that violate federal law are void.**

21          Under ERISA, no plan provision that violates federal law can be enforced to the detriment of

22   a beneficiary. *See Bio-Medical Applications*, 656 F.3d at 284. Such provisions are void *ab initio*,

23

24   ───────────────

[10] To be clear: the "regulations implementing ERISA" that Amy's cites (Mot. 15) are relevant only to

25   DaVita's 29 U.S.C. § 1182 ERISA discrimination claim; they have no relevance to the MSPA claim.

26   [11] Amy's conduct separately warrants recovery because it violates ERISA's anti-discrimination rules,
     29 U.S.C. § 1182 (Count Two). Amy's may ultimately escape liability if it can show that the
     restrictions on dialysis benefits apply uniformly and are "not directed at individual participants or

27   beneficiaries." 29 C.F.R. § 2590.702(b)(2)(i)(B). However, this is a question of fact that is
     inappropriate to adjudicate on a 12(b)(6) motion, because it is certainly plausible that Amy's adopted

28   its "cost-containment" program as a result of high dollar claims by Patient 1.

1  constitute a breach of fiduciary duty, and can be stricken from the plan under 29 U.S.C. § 1132(a)(3)

2  (providing for appropriate equitable relief to remedy violations of ERISA) (Count Four). Moreover, a

3  decision to deny benefits based on a plan provision that violates federal law is, as a matter of law,

4  arbitrary and capricious under 29 U.S.C. § 1132(a)(1)(B) (Count Three). *Id.* at 284.

5  The Sixth Circuit in *Bio-Medical Applications* applied this rule in the context of an MSPA

6  violation, holding that "the plan provision terminating coverage [in violation of the MSPA] is void for

7  violating federal law, and [the plan's] decision to deny benefits is arbitrary and capricious for the same

8  reason." *Id.* The same is true here. Accordingly, because DaVita holds a valid assignment from Patient

9  1 (*supra* 4-9), it may seek redress for Amy's MSPA violations via an ERISA benefits claim or an

10  ERISA fiduciary breach claim—where payment by Medicare is irrelevant. *See id.*

11  **2.    DaVita also may seek redress for Amy's MSPA violation via the MSPA's**

12  **private right of action.**

13  The MSPA's private right of action provides a second—and independent—avenue for DaVita

14  to remedy Amy's substantive violation. The MSPA provides: "There is established a private cause of

15  action for damages . . . in the case of a primary plan which fails to provide for primary payment (or

16  appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3).

17  The plain language of that provision means that a private party like DaVita may sue when the plan has

18  failed to provide for primary payment as required. Nothing more is necessary—the availability of the

19  right to sue does not turn on any action (or inaction) by Medicare.

20  Amy's correctly notes that the Sixth Circuit and other courts following it have held otherwise,

21  requiring Medicare to actually make a payment that the plan should have made. *Bio-Medical*

22  *Applications*, 656 F.3d at 287. But DaVita respectfully submits that this Court should draw a different

23  conclusion. Those courts incorrectly premise the availability of the MSPA's *private* right of action on

24  whether the government has suffered *public* harm, even though (1) the statute separately provides a

25  government-only cause of action where Medicare has stepped in, (2) the government is not entitled to

26  a share of a private party's recovery, and (3) every circuit to address the issue has held the cause of

27  action exists to remedy private harm, not harm to the government.

28

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-06975-JST

1    This Court should therefore hold that the MSPA's private right of action permits suit any time

2    where, as here, a private plan fails to meet its payment obligations under the MSPA. That conclusion

3    better comports with the plain language of the statute, the Centers for Medicare and Medicaid Services

4    (CMS) MSPA Manual, and Ninth Circuit authority explaining that "[t]he Private Cause of Action

5    applies in the case of a primary plan which fails to provide for primary payment" as required by the

6    MSPA. *Parra v. PacifiCare of Ariz.*, 715 F.3d 1146, 1154 (9th Cir. 2013).[12]

7        1. In interpreting the language of the MSPA's private cause of action, both CMS and the Ninth

8    Circuit have adopted DaVita's reading—that the cause of action is available any time a primary plan

9    fails to make a required payment. The CMS MSPA Manual says "any claimant (including a . . .

10   provider . . . ) has the right to take legal action against, and to collect double damages from a [private

11   plan], that fails to pay primary benefits for services covered by the [private plan]." MSPA Manual,

12   Ch. 1 § 30.B. CMS makes no mention of Medicare being out of pocket. Although agency manuals are

13   not entitled to *Chevron*-style deference, they are "entitled to respect" as persuasive authority under

14   *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000).

15       The only on-point Ninth Circuit case likewise adopted DaVita's formulation: "[t]he Private

16   Cause of Action applies 'in the case of a primary plan which fails to provide for primary payment'"

17   as required by the MSPA. *Parra*, 715 F.3d at 1154 (citation omitted). The court in *Parra* did not face

18   the question whether Medicare must be out of pocket, *see id.* at 1153-56, but *Parra*'s straightforward

19   reading harmonizes the statute's plain text and the circuits' unanimous conclusion that the private right

20   of action exists to remedy private, not public, injury. *See id.* at 1154-55 ("The Private Cause of Action

21   was intended to allow private parties to vindicate wrongs occasioned by the failure of primary plans

22   to make payment." (citing *Woods v. Empire Health*, 574 F.3d 92, 98 (2d Cir. 2009)). This Court should

23   follow *Parra* and the expert agency tasked with interpreting the MSPA and hold that DaVita may sue

24   under the MSPA's private cause of action regardless of any payment by Medicare.

25       2. This common-sense interpretation better accords with the statute's plain text as well. Rather

26   than distort the statute's nested cross-references to mean that a primary plan *fails* to provide for

27

28

---

[12] Although DaVita's ability to proceed via ERISA turns on its patient assignment, Amy's does not dispute that DaVita may proceed under the MSPA in its own right.

primary payment only if Medicare decides to *make* a payment, this Court should adopt the more natural reading—that the cause of action is available whenever the plan fails to make a required payment, regardless of whether Medicare steps in.

The cause of action is available when a primary plan "fails to provide for primary payment . . . in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3). The first step in unpacking this text is determining when a primary plan fails to make payment in accordance with "paragraph (1)." That much, as *Bio-Medical Applications* put it, "is easy." 656 F.3d at 285. "A primary plan fails to pay under paragraph (1) by, among other things, 'taking into account' that a planholder is entitled to Medicare benefits after being diagnosed with end-stage renal disease." *See id.* at 285.

It is the second part—failing to pay "in accordance with paragraph[] . . . (2)(A)"—that (understandably) confounded the Sixth Circuit. Paragraph (2)(A) says "[p]ayment under this subchapter may not be made [by Medicare], except as provided in subparagraph [2](B), with respect to any item or service to the extent that . . . payment has been made, or can reasonably be expected to be made . . . as required under paragraph (1)." 42 U.S.C. § 1395y(b)(2)(A). Subparagraph (B), in turn, gives the Secretary authority to make "conditional" payment if a plan has not or cannot reasonably be expected to pay promptly. It also requires the plan to repay Medicare if the Secretary makes such a payment and permits the Secretary to file a lawsuit to recover those amounts. *Id.*

In plain English: As a general rule, Medicare may not pay for anything the MSPA requires a primary payer to cover. But if the primary payer fails to pay, the Secretary *may* step in, but does not have to. When this happens, the plan incurs an obligation to repay Medicare and the federal government is entitled to file suit.

The key question, then, is what the statute means by permitting suit when "a primary plan . . . fails to provide for primary payment . . . in accordance with paragraph[] . . . (2)(A)." 42 U.S.C. § 1395y(b)(3). The most natural reading is that the primary plan fails to pay in accordance with paragraph (2)(A) when it does not provide coverage to ESRD patients as required by the MSPA. That is the only way the primary plan *itself* could fail to comply with paragraph (2)(A). *See id.*; *Bio-Medical Applications*, 656 F.3d at 286. The rest of paragraph (2)(A) discusses when *the Secretary* is *permitted* to make payment. But the cause of action contains no language about what the Secretary must do

17

1    before a private party brings suit. And the Secretary's decision to step in (or not) has no bearing on

2    whether the plan itself "fail[ed]" to pay as required. 42 U.S.C. § 1395y(b)(3).

3       3. The Sixth Circuit drew a different conclusion in *Bio-Medical Applications*. It held that the

4    best way to reconcile the layers of statutory language was to require that Medicare actually have made

5    a payment where the plan was supposed to have paid. 656 F.3d at 287. That conclusion was mistaken.

6       As the Sixth Circuit itself noted, the only way a primary plan can *itself* fail to comply with

7    paragraph (2)(A) is by failing to make a required payment. The text says nothing about what the

8    Secretary must do before a private party may sue. Indeed, the Secretary's action is optional. And where

9    the Secretary does step in, the statute creates *an independent obligation* for the plan to repay Medicare,

10   and a *separate*, *government-only* cause of action to recover those amounts. 42 U.S.C.

11   § 1395y(b)(2)(B). The *private* right of action should thus be keyed to the *private* parties' conduct.

12      The Sixth Circuit's contrary view would make sense only if the MSPA's right of action existed

13   to remedy the *government's* injury—for example, if it were a qui tam statute. But as noted, the statute

14   separately accounts for the injury Medicare incurs when the Secretary steps in. Nor is the government

15   entitled to share in a private party's recovery under the private cause of action—"the victorious party

16   will keep the entirety of any recovery." *Woods*, 574 F.3d at 98.

17      That is why every court of appeals to address the issue has concluded that the MSPA's private

18   right of action permits private parties to recover solely for their *own* injuries, expressly rejecting the

19   idea that they may proceed based on harm to the government. *See id.* ("[T]he MSP[A] allows a private

20   party not to bring suit on behalf of the Government to remedy any wrongs done thereto, but rather to

21   bring suit in the party's own name to remedy the wrong done to it—namely the failure of a primary

22   plan to make the payments required of it on behalf of the private party bringing the suit."); *In re*

23   *Avandia*, 685 F.3d 353, 359 n.9 (3d Cir. 2012) (collecting cases from the First, Second, Sixth, Eighth,

24   and Eleventh Circuits). Because the private cause of action vindicates *private* injury—and the statute

25   accounts separately for harm to the government—the Sixth Circuit went astray in making government

26   injury a prerequisite to suit.

27      DaVita's reading also better promotes the MSPA's dual purposes of protecting Medicare's fisc

28   and patients with ESRD. The best way to protect Medicare is to head off misconduct *before* it harms

18

Medicare, not by making Medicare incur the cost in the first instance. Moreover, the Sixth Circuit's view would shut out of the private cause of action people the MSPA expressly protects. The MSPA protects ESRD patients "entitled to or eligible for" Medicare, yet the Sixth Circuit's reading permits suit only when a patient is actually *enrolled* in Medicare (because that is the only time Medicare will ever make payment). 42 U.S.C. § 1395y(b)(1)(C). Thus, permitting suit based solely on the plan's failure to pay both better accords with the text of the MSPA and better carries out its purposes. The Court should hold that DaVita may proceed under the MSPA's private cause of action.

## III. DaVita Has Stated A Benefits Claim And A Fiduciary Breach Claim Under ERISA.

ERISA allows beneficiaries (and their assignees) to pursue several different kinds of claims. First, where the terms of the plan entitle a participant to greater benefits than she actually received, the participant (or her assignee) may pursue a benefits claim under 29 U.S.C. § 1132(a)(1)(B). Second, ERISA imposes strict fiduciary duties on fiduciaries of ERISA plans. Among other things, fiduciaries must act prudently and loyally, and they must clearly disclose the limits on participants' benefits. When the fiduciary fails to do so, a participant (or her assignee) may obtain equitable relief under 29 U.S.C. § 1132(a)(3).

Here, DaVita brings both a benefits claim and a fiduciary breach claim, and both of those claims have multiple aspects. *First*, as noted, Amy's MSPA violation can be remedied via an ERISA benefits claim. A denial of benefits based on a plan provision that violates federal law (here, the dialysis carve-out) is an abuse of discretion. The MSPA violation also gives rise to a fiduciary breach claim because including an illegal provision in the plan violates a fiduciary's duty of prudence.

*Second*, although the Amy's Plan tells participants that all dialysis claims will be subject to "mandated cost review," it nonetheless leads them to believe that they (1) will continue to have in-network protections if they visit preferred providers, and (2) will receive reimbursement at a non-Medicare based rate. The Plan's terms thus do not authorize Amy's network elimination and Medicare-based reimbursement, giving rise to a benefits claim under 29 U.S.C. § 1132(a)(1)(B). At minimum,

19

the Plan failed to adequately disclose these limits on dialysis coverage, meaning that DaVita is entitled to seek equitable remedies for fiduciary breach under 29 U.S.C. § 1132(a)(3).[13]

**A.   DaVita has stated a claim for benefits under 29 U.S.C. § 1132(a)(1)(B).**

1. The first basis for DaVita's § 1132(a)(1)(B) benefits claim is straightforward. Amy's denied Patient 1 full reimbursement based on a plan provision (the dialysis carve-out) that violates the MSPA. *See supra* 10-14. As the Sixth Circuit explained in *Bio-Medical Applications*, "the plan provision [that violates the MSPA] is void for violating federal law, and [the plan's] decision to deny benefits is arbitrary and capricious for the same reason." 656 F.3d at 284; *see also Townsend v. Thomson Reuters Grp. Disability Income Ins. Plan*, 807 F. Supp. 2d 924, 926 (C.D. Cal. 2011) ("The Court finds that the Complaint asserts a cause of action for benefits under ERISA, as Plaintiff alleges that Defendants abused their discretion by terminating the LTD benefits in violation of Section 10144 [a provision of state law]."). Had the Plan not relied on the illegal plan provision to determine Patient 1's reimbursement, it would have paid the significantly higher contractually negotiated rates that it had paid until it enacted its dialysis carve-out. Compl. ¶¶ 34, 44, 46. DaVita has accordingly stated a claim for benefits based on Amy's violation of the MSPA.[14]

2. Aside from the MSPA violation, DaVita has also stated a claim for benefits based on the Plan's complete network elimination and its improper reimbursement of dialysis claims at a Medicare-based rate, because the Plan does not authorize either of these steps. Amy's is therefore incorrect to argue that "DaVita has identified no Plan provision entitling it to the benefits it now seeks." Mot. 16. On the contrary, both aspects of DaVita's benefits claim come directly from the Plan's terms.

First, the Plan tells participants that if they visit a "preferred provider," they will be protected from balance billing, and the dialysis carve-out nowhere authorizes the elimination of that protection. According to the Plan, "preferred providers" have agreed to accept the Plan's reimbursement amounts

---

[13] Amy's argument that it cannot be liable on any claim because ERISA permits plan amendments is inscrutable. Mot. 25. Nothing in ERISA permits Amy's to enact plan amendments that violate the law.

[14] DaVita has adequately alleged exhaustion of Patient 1's administrative remedies under ERISA. "DaVita submitted two levels of appeal to the Plan's appeal administrator." Compl. ¶ 56(h). The administrator "denied the appeals and informed DaVita that it was entitled to file suit under ERISA." *Id.* ¶ 56(h). Amy's has no basis to dispute these allegations on a motion to dismiss.

1   as "payment in full" for the provider's services—*i.e.*, the participant will not be subject to residual

2   financial liability. Plan at 118; *see id.* at 17. It is only if the participant visits a "nonpreferred provider"

3   that she "is responsible for the remaining balance" that the Plan does not pay. *Id.* The dialysis carve-

4   out does nothing to change the distinction between preferred and nonpreferred providers. Although it

5   tells participants that all dialysis claims will be subject to a "mandated cost review," it discusses *only*

6   changes in reimbursement amounts. *Id.* at 36-37. It *nowhere* authorizes complete elimination of the

7   protections that come with seeking treatment from a preferred provider. *Id.* Thus, the elimination of

8   those protections violates the terms of the Plan and can be remedied under § 1132(a)(1)(B).

9       Second, the Plan's terms likewise preclude reimbursement pegged to the Medicare fee

10   schedule. The Plan says that dialysis will be reimbursed based on the plan administrator's calculation

11   of the "Usual and Reasonable" charge for dialysis. Compl. ¶ 49; Plan at 37. It then lists various factors

12   that will be used to calculate the "Usual and Reasonable" amount. *Id.* Medicare's fee schedule is not

13   among them. *Id.* By contrast, the Plan's definition of "Usual and Customary" *does* make reference to

14   Medicare's rates. *Id.* at 124. But the Plan takes care to say that "[t]he term 'usual and customary' is

15   not intended to be the same as the term 'Usual and Reasonable,' as that term is defined in the Dialysis

16   Treatment-Outpatient provision." *Id.*; Compl. ¶ 49.

17       In other words, the Plan takes pains to exclude Medicare's rates from the calculation of dialysis

18   reimbursement amounts. Yet since January 1, 2017, Amy's has, in fact, tied its reimbursement amount

19   to the Medicare fee schedule. *Id.* ¶ 50. The Plan's Medicare-based reimbursement amounts, moreover,

20   are far lower than what a permissible calculation of Usual and Reasonable would yield. *Id.* Thus, under

21   the terms of the Amy's Plan, Patient 1 is entitled to higher reimbursement than he actually received.

22   That, too, is a paradigmatic claim for benefits under § 1132(a)(1)(B).

23       For the same reasons, DaVita has plausibly alleged that the plan administrator abused its

24   discretion in eliminating network protection and reimbursing Patient 1's treatment at Medicare-based

25   levels. Although Amy's is correct that "an ERISA plan administrator with discretionary authority to

26   interpret a plan is entitled to deference in exercising that discretion," *Conkright v. Frommert*, 559 U.S.

27   506, 509 (2010) (Mot. 16), that discretion is not unlimited. A plan administrator abuses its discretion

28   when it acts under an interpretation of the plan that contradicts the plan's plain meaning. *See Tapley*

*v. Locals 302 & 612 of Int'l Union of Operating Engineers-Emps. Const. Indust. Ret. Plan*, 728 F.3d 1134, 1143 (9th Cir. 2013) ("The availability of earned retirement benefits cannot be frustrated by an untethered interpretation of the Plan that takes away what the Plan was designed to provide. Simply stated, what the Plan provides, the Trustees may not take away. It is not for this Court to proffer a reasonable interpretation of Plan language, but instead to identify and reject any interpretation that is arbitrary, misfocused and contrary to the intent of those responsible for its terms."); *see also, e.g.*, *Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 65 (1st Cir. 2013) ("the discretion of a plan administrator is cabined by the text of the plan and the plain meaning of the words used. . . . 'the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning'" (citations omitted)).

That is what happened here. There is *no* Plan language authorizing Amy's elimination of network protections—its decision to eliminate those protections is entirely "untethered" to the Plan and thus an abuse of discretion. *Tapley*, 728 F.3d at 1143. Similarly, the Plan describes certain factors that may permissibly be used to calculate the "Usual and Reasonable" charge for dialysis. Those factors cabin the administrator's discretion, and the Medicare fee schedule is not among them. Thus, by premising its Usual and Reasonable calculation on the Medicare fee schedule—rather than the permissible factors listed by the Plan—the administrator abused its discretion. DaVita has stated a benefits claim.

**B.     DaVita has stated a fiduciary breach claim under 29 U.S.C. § 1132(a)(3).**

1. A "plan provision [that violates the MSPA] is void for violating federal law." *Bio-Medical Applications*, 656 F.3d at 284. And including an illegal provision in the Plan violates a fiduciary's fundamental duty of prudence. *See* 29 U.S.C. § 1104. Thus, Amy's breached its fiduciary duties by including the illegal dialysis carve-out in the Plan.

2. Aside from its MSPA violation, Amy's also violated its duty to clearly disclose the limits on benefits available to plan participants. *See Acosta v. Pac. Ents.*, 950 F.2d 611, 619 (9th Cir. 1991), *as amended on reh'g* (Jan. 23, 1992); 29 U.S.C. § 1022(a). Amy's violated this duty in two key ways: (1) it does not tell participants that they will be exposed to balance billing regardless of the provider

1  from which they receive dialysis treatment, and (2) it does not tell participants their treatment will be

2  reimbursed at an artificially low, Medicare-based rate. Compl. ¶¶ 87-88.

3      Here again, Amy's argument that "[t]he Plan clearly sets forth the availability of

4  reimbursement" (Mot. 18) simply ignores the Complaint's allegations—and the plan documents'

5  language. A reasonable participant would be blindsided to learn that she will be on the hook for all

6  amounts that Amy's refuses to pay, even if she visits a *preferred* provider. The Plan tells participants

7  they will have that protection (Plan at 17, 118), and the dialysis carve-out nowhere says otherwise.

8  That information, moreover, is critically important to participants—knowing whether a patient will be

9  exposed to balance billing is perhaps the most important factor in a patient's treatment decision.

10  Compl. ¶ 88. Amy's failure to disclose material benefit limitations gives rise to a fiduciary breach.

11      3. Amy's also argues that, even if it violated its fiduciary duties, ERISA offers DaVita no

12  remedy for those violations. That is incorrect. DaVita is entitled to each of the remedies the Supreme

13  Court has authorized for a fiduciary's faulty disclosures: injunctive relief, surcharge, reformation, and

14  estoppel. *CIGNA v. Amara*, 563 U.S. 421, 441 (2011).

15      First, DaVita may obtain an injunction requiring Amy's to disclose to dialysis patients (1) that

16  they will be exposed to balance bills regardless of their provider, and (2) that dialysis reimbursement

17  will be tied to the Medicare fee schedule. Amy's does not address this remedy in its motion, and it is

18  enough, standing alone, for the fiduciary breach claim to proceed.

19      DaVita is likewise entitled to the surcharge remedy. Surcharge is a "form of monetary

20  'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust

21  enrichment." *CIGNA*, 563 U.S. at 441 (citation omitted). It requires harm and causation, but not

22  detrimental reliance. *Id.* at 444. And despite Amy's assertions to the contrary (Mot. 20), its inadequate

23  disclosures caused obvious harm to participants: the Plan says participants can be protected from

24  balance billing and that dialysis providers will be reimbursed at a non-Medicare based rate.  In reality,

25  participants face significant residual liability for the amounts the Plan has refused to pay. Compl.

26  ¶¶ 87-89(a). Amy's can be surcharged those amounts.

27      DaVita may also pursue reformation and estoppel. The core point of these remedies is to hold

28  plan fiduciaries to the benefits they led participants to believe they would have. Amy's argues

23

reformation is unavailable because there was no mutual mistake or *intentional* fraud. But "[f]raud has a broader meaning in equity (than at law) and intention to defraud or to misrepresent is not a necessary element." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 193 (1963) (citation omitted). "'[T]he equitable conception of fraud,' . . . generally consists of 'obtaining an undue advantage by means of some act or omission which is unconscientious or a violation of good faith.'" *Amara v. CIGNA Corp.*, 775 F.3d 519, 526 (2d Cir. 2014) (quoting 3 John N. Pomeroy, *A Treatise on Equity Jurisprudence* § 873 at 420-21 (5th ed. 1941)). Indeed, "[f]raud . . . in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken." *Capital Gains*, 375 U.S. at 194. Amy's failure to disclose the elimination of network coverage plausibly falls within this scope, as does Amy's failure to disclose that dialysis providers will be reimbursed a Medicare-based rate.

Amy's challenge to the estoppel remedy fares no better. It contends that (1) applying estoppel would impermissibly contradict the Plan's terms, and (2) this case does not present the "extraordinary circumstances" necessary to warrant estoppel. Amy's is again wrong. *First*, estoppel would be entirely consistent with the Plan's terms; the Plan facially tells participants they *will* have network protections and *will* be reimbursed at a non-Medicare based rate. *Second*, the extraordinary circumstances requirement can by met by "evidence that plaintiffs are particularly vulnerable." *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 957 (9th Cir. 2014) (citation omitted). That is absolutely the case for ESRD patients. DaVita has accordingly stated a plausible estoppel claim.

## IV.   DaVita Has Stated Claims Under State Law.

DaVita also adequately alleges claims under state law because Amy's misled DaVita about the level of payment it could expect for its services. The Complaint alleges that DaVita contacted Plan representatives in the course of treating Patient 1. Compl. ¶ 92. These representatives initially led DaVita to believe it would continue to receive the negotiated rates it had received up until January 1, 2017. *Id.* And even after it became clear that DaVita was being treated as an out-of-network provider, the Plan never informed DaVita that it would be reimbursed at a Medicare-based rate. *Id.* In reliance on these communications, DaVita continued to treat Patient 1. Compl. ¶ 93. Yet DaVita in fact received

reimbursement at a Medicare-based rate far lower than its negotiated rates (or an appropriate out-of-network rate). *Id.* These allegations plausibly state claims for negligent misrepresentation, promissory estoppel, and quantum meruit. Amy's challenges yet again ignore the Complaint's allegations.[15]

**Negligent misrepresentation**. With respect to negligent misrepresentation, Amy's argues that DaVita entirely failed to plead a misrepresentation or reasonable reliance. Mot. 23. As explained above, that is simply untrue. Amy's assertion that any misrepresentation did not concern "a past or existing material fact" is likewise contradicted by the Complaint: the misrepresentation concerned DaVita's *then-existing rate of payment*, for treatment it was rendering *at that time*. Compl. ¶¶ 92-93.

**Promissory estoppel**. As to promissory estoppel, the only argument Amy's adds is that even if it made a clear and unambiguous promise, "the Plan could not be bound by an agreement contradicting the Plan's terms." Mot. 24. But as explained above, it is the Medicare-based reimbursement that contradicts Plan terms. A non-Medicare-based rate is *required* by the Plan.

**Quantum meruit**. Finally, as to quantum meruit, Amy's argues that DaVita failed to allege it requested service from DaVita or agreed to pay DaVita a particular rate. Mot. at 25. But DaVita is not required to allege a particular dollar amount that Amy's agreed to pay—alleging that Amy's agreed to pay the negotiated rate (or at least a non-Medicare based rate) is enough. And a factfinder could certainly conclude that Amy's knowledge and authorization of Patient 1's ongoing treatment qualifies as a "request" for service. Compl. ¶ 92. Amy's eventual refusal to pay a fair price for services rendered is exactly why quantum meruit exists.

Thus, DaVita has stated claims under state law.[16]

## CONCLUSION

Amy's motion should be denied. Alternatively, DaVita should be granted leave to amend.

---

[15] If necessary, DaVita can amend its Complaint to include additional detail about its communications with Plan representatives.

[16] Defendants' other attacks (preemption and lack of subject matter jurisdiction) are also unavailing. First, if the facts underlying the state law claims permit ERISA recovery, DaVita agrees the state law claims are preempted, but if DaVita's recovery is barred under ERISA for any reason, the state-law claims cannot be preempted. *Curtis v. Nev. Bonding Corp.*, 53 F.3d 1023, 1027 (9th Cir. 1995), *over'd on other grounds by Leeson v. Transam. Disability Income Plan*, 26 F.3d 930 (9th Cir. 2012). Second, although this Court *could* decline to exercise supplemental jurisdiction if all federal claims are dismissed, it is beyond cavil that such dismissal is discretionary, not mandatory.

1   Dated: February 22, 2019                          Respectfully submitted,

2                                                     /s/ Brendan S. Maher
                                                      Peter K. Stris
3                                                     Brendan S. Maher
                                                      Rachana A. Pathak
4                                                     Michael Donofrio

5                                                     **STRIS & MAHER LLP**
                                                      725 S. Figueroa Street, Suite 1830
6                                                     Los Angeles, CA 90017
                                                      Telephone: (213) 995-6800
7                                                     Facsimile: (213) 261-0299

8                                                     *Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that on February 22, 2019, I electronically filed the foregoing document with the Clerk of Court using the Court's ECF system, which will send notification of such filing to counsel of record for Defendants.

/s/ Brendan S. Maher
Brendan S. Maher

OPPOSITION TO MOTION TO DISMISS
CASE NO. 3:18-CV-06975-JST