Floyd G. Short (appearance *pro hac vice*)
Katherine M. Peaslee (CA Bar #310298)
**SUSMAN GODFREY L.L.P.**
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Fax: (206) 516-3883
fshort@susmangodfrey.com
kpeaslee@susmangodfrey.com

Catriona Lavery (CA Bar #310546)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Fax: (310) 789-3150
clavery@susmangodfrey.com

*Attorneys for Defendants Amy's Kitchen, Inc.*
*Employee Benefit Health Plan and Amy's Kitchen, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVITA, INC., et al., | Case No. 3:18-cv-06975-JST |
| Plaintiffs, | |
| v. | **REPLY IN SUPPORT OF DEFENDANTS'** |
| | **MOTION TO DISMISS** |
| AMY'S KITCHEN, INC. EMPLOYEE | |
| BENEFIT HEALTH PLAN, et al., | Hearing Date: April 4, 2019 |
| | Time: 2:00 p.m. |
| Defendants. | Place: Courtroom 9, 19th Floor, United States |
| | District Court, 450 Golden Gate Ave., San |
| | Francisco, CA |
| | Complaint Filed: November 16, 2018 |

Case No. 3:18-cv-06975-JST
DEFS.' REPLY ISO MOTION TO DISMISS

1

## TABLE OF CONTENTS

I.      ARGUMENT .................................................................................................... 2

        A.      DaVita Lacks Article III Standing to Bring Claims as an Assignee. ...................... 2

        B.      The Assignment from Patient 1 Does Not Extend Beyond Benefits Claims. .......... 3

        C.      DaVita Fails to Establish Any Violation of the MSPA. ............................................ 4

                (1)     An MSPA cause of action requires actual expenses paid by
                        Medicare. ..................................................................................................... 5

                (2)     The Plan neither "takes into account" nor "differentiates" based on
                        Medicare eligibility. ................................................................................... 7

        D.      DaVita Has No Cause of Action under ERISA. ....................................................... 10

                (1)     DaVita has no viable denial-of-benefits claim under ERISA. .................... 10

                (2)     DaVita cannot state a claim for breach of fiduciary duty. .......................... 11

                (3)     DaVita cannot assert an MSPA claim via ERISA. ...................................... 12

        E.      DaVita Has No Right to Surcharge, Reformation, or Estoppel. ............................. 13

        F.      DaVita Fails to Plead Any Viable Claims under State Law. ................................... 14

II.     CONCLUSION ............................................................................................... 15

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Baptist Mem. Hosp. v. Pan Am. Life Ins. Co.*,
    45 F.3d 992 (6th Cir. 1995)...................................................................................................4, 13

5

*Bio-Medical Applications of Tennessee v. Central States Se. & Sw. Areas Health &*
    *Welfare Fund*,
6

    656 F.3d 277 (6th Cir. 2011).................................................................................................6, 13

7

*Blue Cross & Blue Shield of Tex., Inc. v. Shalala*,
8

    995 F.2d 70 (5th Cir. 1993)..........................................................................................................5

9

*Care First Surgical Ctr. v. ILWU-PMA Welfare Plan*,
    No. CV1401480MMMAGRX, 2014 WL 12573014 (C.D. Cal. Dec. 26, 2014) ........................4
10

11

*Curcio v. John Hancock Mut. Life Ins. Co.*,
    33 F.3d 226 (3d Cir. 1994)........................................................................................................14
12

13

*Curtis v. Nevada Bonding Corp.*,
    53 F.3d 1023 (9th Cir. 1995)....................................................................................................14

14

*Curtiss-Wright Corp. v. Schoonejongen*,
15

    514 U.S. 73 (1995) ..............................................................................................................10, 11

16

*Daniels-Hall v. Nat'l Educ. Ass'n*,
17

    629 F.3d 992 (9th Cir. 2010)......................................................................................................2

18

*Doe One v. CVS Pharmacy, Inc.*,
    348 F. Supp. 3d 967 (N.D. Cal. 2018) ....................................................................................10

19

*Gabriel v. Alaska Elec. Pension Fund*,
20

    773 F.3d 945 (9th Cir. 2014)....................................................................................................14

21

*Harris Corp. v. Humana Health Ins. Co. of Fla.*,
    253 F.3d 598 (11th Cir. 2001)..................................................................................................13
22

23

*Leeson v. Transamerica Disability Income Plan*,
    671 F.3d 969 (9th Cir. 2012)....................................................................................................14

24

*Lockheed Corp. v. Spink*,
25

    517 U.S. 882 (1996) .................................................................................................................11

26

*Moon v. BWX Techs., Inc.*,
    577 F. App'x 224 (4th Cir. 2014).............................................................................................12

27

28

*Nat'l Renal All., LLC v. Blue Cross & Blue Shield of Ga., Inc.*,
   598 F. Supp. 2d 1344 (N.D. Ga. 2009) ............................................................6, 7

*Nw. Mut. Life Ins. Co. v. Resolution Tr. Corp.*,
   848 F. Supp. 1515 (N.D. Ala. 1994) ..................................................................13

*Olson v. Gen. Dynamics Corp.*,
   960 F.2d 1418 (9th Cir. 1991) (Reinhart, J., concurring) ..................................14

*Pac. Bay Recovery, Inc. v. Cal. Phys.' Servs., Inc.*, 12 Cal. App. 5th 200, 215 (Ct.
   App. 2017)............................................................................................................15

*Parra v. PacifiCare of Ariz.*,
   715 F.3d 1146 (9th Cir. 2013)...............................................................................5

*Peacock v. Thomas*,
   516 U.S. 349 (1996)........................................................................................12, 13

*Perry v. United Food & Comm. Workers Dist. Unions*,
   64 F.3d 238 (6th Cir. 1995)..................................................................................13

*Spinedex Phys. Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
   770 F.3d 1282 (9th Cir. 2014)............................................................................3, 4

*Star Dialysis, LLC v. WinCo Foods Employee Benefits Plan*,
   No. 18-cv-00482 (D. Id.)........................................................................................9

*Westfall v. Bevan*,
   No. CIV.A.308-CV-0996-D, 2009 WL 111577 (N.D. Tex. Jan. 15, 2009)...............13

*Woods v. Empire Health Choice, Inc.*,
   574 F.3d 92 (2d Cir. 2009)......................................................................................5

**Federal Statutes**

29 U.S.C.
   §§ 1024 and 1132 ...................................................................................................4
   § 1132(a)(3)..........................................................................................................12

42 U.S.C.
   § 1395c ...................................................................................................................7
   § 1395y(b)(1)(C) ....................................................................................................5
   § 1395y(b)(2)(A) ....................................................................................................7
   § 1395y(b)(2)(B)(iii) ..............................................................................................6

Employee Retirement Income Security Act (ERISA), 29 U.S.C.
   § 1001 *et seq*.................................................................................... *passim*

**Other Authorities**

42 C.F.R. § 411.108 .......................................................................................................8

60 Fed. Reg. 45344-01, at 45351 ..................................................................................8

MSPA Manual, Ch. 1 § 30.B ..........................................................................................5

Nothing in DaVita's Response supports denial of Amy's motion to dismiss. Lacking both factual and legal support for its claims, DaVita repeatedly ignores or misrepresents the plain terms of the Plan document, insisting that the allegations in its Complaint must simply be accepted as true, when in fact the Plan document on its face shows those allegations are not correct, let alone plausible. For example, DaVita claims "differentiated" treatment of individuals with ESRD, despite the Plan's unequivocal statement that *all* dialysis claims will be treated the same "regardless of the condition causing the need for dialysis." And DaVita premises its "denial of benefits" claim on a failure to provide "in-network" dialysis providers, yet the Plan makes expressly clear that the in-network/out-of-network framework does not apply to dialysis claims, which are subject to a separate "Dialysis Program." Thus, DaVita's factual allegations fail because the Plan document contradicts them. And DaVita's claims each fail as a matter of law, notwithstanding DaVita's diversionary reference to the number of arguments raised by Amy's motion (which simply reflects DaVita's kitchen-sink pleading and the myriad deficiencies of its claims) and DaVita's emotional appeal to a purely fictional "death, debt, or Medicare" dilemma that Patient 1 has not actually faced (as DaVita concedes by failing to allege such facts).

The reality behind DaVita's lawsuit is that Amy's amended its Plan and added the Dialysis Program to contain outrageous dialysis costs, and DaVita doesn't like it. The further reality is that Patient 1 (and thus DaVita) received precisely the benefits defined by the Plan, and neither the Plan's definition of those benefits nor the payments themselves violated the MSPA or ERISA. DaVita cannot overcome its threshold lack of standing or that the purpose of the MSPA is to protect the Medicare fisc, as made clear by both the MSPA's text and interpreting case law. DaVita similarly cannot overcome or evade the law of ERISA, under which discretionary plan-design decisions like the Dialysis Program implemented by Amy's Plan cannot support a claim. Finally, DaVita's state law claims are pre-empted regardless of whether DaVita can seek relief under ERISA and insufficiently pleaded in any event. For all of these reasons, Amy's motion should be granted in full, and DaVita's Complaint should be dismissed with prejudice because any amendment would be futile.

I.      **ARGUMENT**

  A.      **DaVita Lacks Article III Standing to Bring Claims as an Assignee.**

  DaVita has failed to allege facts establishing Article III standing for Patient 1, and that is fatal to its claims as an assignee under either ERISA or the MSPA. DaVita argues that Patient 1 suffered Article III injury through a "denial of benefits," but this argument hinges entirely on DaVita's baseless assertion "that the Plan entitles Patient 1 to better coverage and higher reimbursement than he actually received." Response at 7. This allegation is incorrect and cannot be credited because it directly contradicts the plain language of the Plan document (which DaVita acknowledges is properly incorporated into the Complaint by reference, Response at 2 n.2). DaVita's allegations need not and cannot be accepted as true on a motion to dismiss when they are directly contradicted by the Plan itself. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (courts deciding a motion to dismiss "are not . . . required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice," which include materials "incorporated . . . into the Complaint by reference," or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences"). DaVita's asserted injury fails because Patient 1 received exactly the coverage and reimbursement to which all Plan members, including Patient 1, are entitled under the Plan's terms.

  DaVita argues that Patient 1 was entitled to "better coverage," relying throughout its Response on "in-network coverage" as a basis for its claims. But nowhere does the Plan document state that dialysis patients will receive "in-network" coverage for dialysis treatment. To the contrary, a chart at the very beginning of the Plan makes clear that the in-network/out-of-network distinction does not apply to dialysis; rather, dialysis treatments are subject to a separate Dialysis Program, Carme Decl. Ex. A, Dkt. 25-2 ("Plan") at 10, which the Plan document then describes in detail, *id*. at 32-33. In fact, the Plan document plainly states that even where a provider "*is or has been a preferred provider*," the plan administrator is nevertheless authorized to apply the "limitations" of the Dialysis Program to the provider's reimbursement rate. *Id*. at 33 (emphasis added). DaVita simply ignores all of this Plan language, which is fatal to its argument that Patient 1 was entitled to in-network coverage or "better" coverage than Patient 1 (and DaVita) received.

As DaVita itself concedes, the speculative possibility that a provider might someday request payment from a beneficiary does not separately establish Article III injury. *See* Response at 8-9. DaVita attempts to create an exception to that rule based on *Spinedex* and an "assignor-assignee relationship," *id*. at 8, but this novel theory fundamentally misconstrues the nature of the injury found in that case. In *Spinedex*, the court held that if the patient-assignors had "sought payment directly from their Plans for treatment provided by *Spinedex*, and if payment had been refused, they would have had an unquestioned right to bring suit for benefits." 770 F.3d at 1291. Thus, *Spinedex*'s holding is simply that if a plan refuses payment to a beneficiary, the beneficiary is injured and has a right to sue, and the beneficiary's assignee would hold that same right. That is not what happened here. *Spinedex* did not allow speculative future liability for payment to create Article III injury, and DaVita cannot use such speculative liability to establish injury here.

### B.   The Assignment from Patient 1 Does Not Extend Beyond Benefits Claims.

DaVita ignores plain Ninth Circuit law requiring that assignments of rights under an ERISA plan must be construed narrowly. In *Spinedex*, the Ninth Circuit held that an assignment stating "[t]his is a direct assignment of my rights and benefits under this policy" did not assign anything beyond a right to benefits payments because, despite the facial breadth of the assignment language, "the entirety of the Assignment indicate[d] that patients intended to assign to [the provider] only their rights to bring suit for payment of benefits." *Spinedex Phys. Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1289 (9th Cir. 2014). Here, the assignment appears to grant similarly broad rights, *see* Carme Decl. Ex. B at 2, but, just as in *Spinedex*, the form taken as a whole indicates that Patient 1 intended to assign to DaVita only the right to sue for payment of benefits. Indeed, DaVita's assignment form expressly states: "[t]he *purpose of this document*" is to "assign[] rights to payments from my insurer and authoriz[e] DaVita to obtain the necessary information to obtain such payment." *Id.* at 1 (emphasis added).[1]

---

[1] DaVita cannot avoid its lack of standing by framing the assignment as "ambiguous." The issue here is not whether the assignment "is capable of two or more reasonable interpretations and therefore leaves doubt as to the parties' intent"; the issue is whether the assignment language

DaVita fails to cite any cases that rebut *Spinedex* or support DaVita's argument that the assignment form gave it the right to sue under ERISA for anything besides a benefits claim. Instead, DaVita relies on two out-of-circuit district court cases that do not apply or address *Spinedex*, and a third case that illustrates the specificity required for assignment of a claim under ERISA's civil enforcement provision and only confirms the ineffectiveness of the assignment here. In the latter case, *Care First Surgical Ctr. v. ILWU-PMA Welfare Plan*, No. CV1401480MMMAGRX, 2014 WL 12573014 (C.D. Cal. Dec. 26, 2014), the assignment stated that the assignors "intend[ed] for their personal standing under ERISA's disclosure and civil enforcement procedures under 29 U.S.C. §§ 1024 and 1132 to be transferred" to the provider. *Id.* at *7 (alteration omitted). As the court explained, the explicit citation to ERISA's civil enforcement provisions left no question that the assignee knowingly granted rights to sue under those provisions. *Id.* This contrasts sharply with a broad, generic assignment of rights or claims, and illustrates the sort of "express and knowing" assignment that is specifically required to transfer claims or rights beyond the right to payment. *Id.* at *6 (quoting *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F.Supp.2d 880, 896 (C.D. Cal. 2012)). The broad, generic language in DaVita's form, which is expressly directed at assignment of recovery for benefits, does not suffice to assign other rights or causes of action under ERISA.

### C.    DaVita Fails to Establish Any Violation of the MSPA.

DaVita fundamentally misconstrues the MSPA and its purpose. DaVita tries to present the MSPA as an antidiscrimination statute, and repeatedly characterizes the MSPA as having the "dual purpose" of not only protecting the Medicare fisc but also preventing discriminatory treatment of a class of patients with ESRD. But this characterization of the statute lacks any statutory, legislative, or judicial support. Rather, in implementing the MSPA, "[t]he sole interest of Congress, as far as the statute discloses, was to provide that Medicare would not have to pay ahead of private carriers in certain situations." *Baptist Mem. Hosp. v. Pan Am. Life Ins. Co.*, 45

---

satisfies the Ninth Circuit's stringent legal standard for what suffices as an express assignment of the right to bring claims under ERISA as an assignee. It does not.

F.3d 992, 998 (6th Cir. 1995); *cf. Blue Cross & Blue Shield of Tex., Inc. v. Shalala*, 995 F.2d 70, 73 (5th Cir. 1993) ("[T]he MSP statute has never created or extended coverage; it has only dictated the order of payment" as between Medicare and a primary plan). Accordingly, no substantive violation of the MSPA can occur unless the alleged "taking into account" or "differentiation" in treatment based on Medicare eligibility impacts the Medicare fisc, and no private right of action exists absent payments made by Medicare. Amy's dialysis cost-containment measures neither "take into account" an individual's eligibility for Medicare due to ESRD, nor "differentiate" between individuals with ESRD and other Plan beneficiaries based on their diagnosis. *See* 42 U.S.C. § 1395y(b)(1)(C). Accordingly, DaVita's claim under the MSPA fails.

### *(1)      An MSPA cause of action requires actual expenses paid by Medicare.*

Every court to consider the question has held that the private right of action under the MSPA requires Medicare to have actually made payments. Simply put, no claim under the Act exists unless Medicare has actually expended funds. The Act's clearly articulated, overarching purpose is to provide financial protection to Medicare.

None of the cases cited by DaVita holds otherwise. DaVita presents a single Ninth Circuit case, *Parra v. PacifiCare of Ariz*ona, 715 F.3d 1146 (9th Cir. 2013), as purportedly "adopting" DaVita's position, but this is flat wrong, as even DaVita candidly admits that "[t]he court in *Parra* did not face the question whether Medicare must be out of pocket." Response at 16. And DaVita's other cited case, *Woods v. Empire Health Choice, Inc.*, 574 F.3d 92 (2d Cir. 2009), addressed a completely different question: Whether the MSPA presents one of the "uncommon" *qui tam* statutes for which Congress has expressly allowed a private plaintiff who does not itself meet the constitutional standing requirements to nevertheless bring suit. *See id.* at 97-98. *Woods* holds that the MSPA does ***not*** fall into this category, which means a private plaintiff must satisfy Article III standing—as must any plaintiff bringing a federal lawsuit. *Id.* at 101.[2]

---

[2] Contrary to DaVita's assertion, the Centers for Medicare and Medicaid Services ("CMS") MSPA manual similarly does not "adopt DaVita's reading" of the MSPA; the cited section merely explains which parties may bring a cause of action under the MSPA—namely, "any claimant," whether "beneficiary, provider, physician, or supplier." MSPA Manual, Ch. 1

In contrast to the cases cited by DaVita, *Bio-Medical Applications of Tennessee v. Central States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277 (6th Cir. 2011), squarely addressed the conditions under which a private plaintiff may bring a claim under the MSPA and held, in line with the MSPA's purpose to protect the Medicare fisc, that Medicare must suffer economic harm—it must have made some payments. 656 F.3d at 287. ***Every court to consider the question has held likewise.*** *See* Motion at 12-13 (collecting cases).

DaVita argues that the private cause of action and the governmental cause of action are entirely separate claims designed to remedy independent harms. Response at 18. Yet the MSPA expressly provides for the government to step in and collect from a private plaintiff that recovers payments made by Medicare. *See* 42 U.S.C. § 1395y(b)(2)(B)(iii); *Bio-Med.*, 656 F.3d at 296 (MSPA serves Medicare's interests by "empower[ing] healthcare providers to sue private insurers who violate the Act," and "then enabl[ing] Medicare to pursue its reimbursement out of the proceeds recovered by the victorious healthcare providers"). The harm is the same.

DaVita's reading of the MSPA depends on what it alleges to be the "dual purpose" of the MSPA to protect Medicare and individuals with ESRD. Response at 18-19. But, as explained above, the statute provides no support whatsoever for such a "dual purpose." Courts have repeatedly rejected arguments that the MSPA is premised on something other than "Medicare's 'fiscal integrity.'" *See Nat'l Renal All., LLC v. Blue Cross & Blue Shield of Ga., Inc.*, 598 F. Supp. 2d 1344, 1353-54 (N.D. Ga. 2009). These rulings are directly in line with the MSPA's text. The statute's "plain language" creates a private cause of action only where a plan fails to provide for primary payment "in accordance" with the "Medicare as Secondary Payer" provisions, and "*those provisions dictate only the liability of private insurance plans relative to the Medicare program.*" *Id.* at 1353 (citation omitted, italics in original).

DaVita attacks *Bio-Medical* with a strawman argument about whether Medicare "may" pay versus when it "must," but a full reading of the statute shows that a plan's "failure" to pay "in

§ 30.B. In other words, it addresses who is a proper party under the MSPA, but provides no commentary at all on what it means for a Plan to "fail to pay" in accordance with the MSPA.

accordance with" the MSPA's provisions can only be understood through reference to *those specific provisions*, and those provisions set forth the situations in which the MSPA should serve only as a "secondary" payer. 42 U.S.C. § 1395y(b)(2)(A). Thus, a plan "fails to pay" when Medicare becomes the *primary* payer—which necessarily requires actual payments. "[T]he fiscal integrity of the Medicare program that the MSP statute was designed to protect" is only at issue where Medicare has actually expended payments. *Nat'l Renal,* 598 F. Supp. 2d at 1353-54 (collecting cases). DaVita's reading of the statute is novel, unprecedented, and wrong.

### (2)   The Plan neither "takes into account" nor "differentiates" based on Medicare eligibility.

DaVita asserts that the Plan "takes into account" Medicare eligibility, but provides no plausible facts to support that contention. Nothing in the Plan references or relies upon a member's Medicare eligibility. Moreover, Medicare does not categorically cover dialysis patients, whereas the Plan's Dialysis Program applies to *all* dialysis claims, regardless of the beneficiary's age, sex, employment history, or diagnosis.[3] Plan at 32. The Plan clearly does not "take into account" Medicare eligibility, nor can DaVita plausibly allege otherwise.[4]

DaVita tries to avoid the Plan's equal treatment of ESRD and non-ESRD patients by asserting that equal treatment is irrelevant to assessing whether a plan "takes into account"

---

[3] Medicare categorically covers all persons with ESRD; it does *not* categorically cover all persons in need of dialysis treatment. *See* 42 U.S.C. § 1395c. As the Medicare Claims Processing Manual illustrates, non-ESRD patients may nevertheless need dialysis treatment. *See* Medicare Claims Processing Manual, Chapter 4, § 200.2 ("Hospital Dialysis Services for Patients With and Without End Stage Renal Disease (ESRD)," discussing circumstances in which a patient "does not have ESRD and is receiving hemodialysis").

[4] DaVita tries to distract by citing to the Dialysis Program's stated purpose, which refers to a desire not to subsidize government plans, but DaVita mischaracterizes Plan language: that section has nothing to do with making benefits decisions based on Medicare eligibility, nor does it single out government plans. Rather, it explains the Plan's desire to avoid subsidizing services that are provided to members of plans with greater bargaining power—i.e., "government *and commercial* plans," Plan at 32 (emphasis added)—by paying higher, extortionate charges that providers such as DaVita demand from health plans with lesser bargaining plans like Amy's Plan. The MSPA "was not intended to force insurance companies to subsidize dialysis treatment" for individuals not covered by a given plan. *Nat'l Renal*, 598 F. Supp. 2d at 1355.

Medicare eligibility in providing benefits. Response at 11 n. 9. This gambit fails for multiple reasons. First, the terms of a plan do not "take into account" Medicare eligibility unless they provide different benefits or levels of coverage to those who are eligible for Medicare versus those who are not. The regulation governing "take into account" claims to which DaVita cites, 42 C.F.R. § 411.108, confirms this. It provides that a plan "takes into account" ESRD-based Medicare eligibility when it limits benefits for such individuals, but not for "similarly situated individuals who are not entitled to Medicare" based on ESRD. *Id.* Amy's Plan does not do that.

Consider two beneficiaries of the same age and sex, with the same employment history, both of whom are in need of dialysis, where the sole difference between them is that one has ESRD and the other does not. Amy's Plan provides *exactly the same benefits* to these two similarly situated individuals. An ESRD diagnosis *itself* cannot be the sole distinction making two individuals differently situated; otherwise, there would be *no* individuals "similarly situated" to ESRD patients, and the regulation prohibiting discrimination between ESRD patients and those "similarly situated" would never apply. Similarly, the rule-making commentary DaVita cites as prohibiting even neutral plan provisions with a disparate *effect* on ESRD patient merely prohibits discriminatory benefits treatment for "similarly situated individuals." 60 Fed. Reg. 45344-01, at 45351.[5] Thus, under DaVita's own cited authorities, where similarly situated individuals—i.e., all those in need of dialysis, regardless of age, sex, employment history, or diagnosis—receive like treatment, a plan does not impermissibly "take into account" their eligibility for Medicare.

DaVita also argues that the Plan "differentiates" benefits provided to persons with ESRD, but DaVita's argument does not actually address a difference in *treatment*; it addresses a difference in *effect*. The fact that identical treatment by the Plan results in different *effects* on

---

[5] DaVita's quotation of this rule-making commentary manipulates its text and omits the end of the relevant sentence. *See* Resp. at 12. The full and correct sentence states: "Plan provisions that have the effect of denying, restricting, or terminating benefits for disabled beneficiaries who have [plan] coverage by virtue of current employment status, but not for similarly situated individuals, are prohibited." 60 Fed. Reg. 45344-01, at 45351 (emphasis added). A explained above, all "similarly situated" patients receive identical benefits under Amy's Plan.

Case No. 3:18-cv-06975-JST
**DEFS.' REPLY ISO MOTION TO DISMISS**       8

1    particular patients is not an example of the "differentiated" *treatment* prohibited by the MSPA.

2    *National Renal Alliance* illustrates this point. In that case the plan did not "take into account" or

3    "differentiate" between ESRD and non-ESRD patients because it "provide[d] the same level of

4    reimbursement for out-of-network dialysis treatment *regardless of the insured's reason for*

5    *receiving the treatment*." *Id*. at 1354 (emphasis plan added). As the court further explained, the

6    significant facts supporting the court's holding were "that there is no allegation that Blue Cross

7    pays a different amount for dialysis treatment of non-ESRD patients than ESRD patients," and that

8    "Blue Cross has designated one amount for dialysis treatment." *Id.* at 1354. The same is true here.

9    Under the Plan's plain terms, "[t]he Dialysis Program shall apply to **all claims** . . . for

10   reimbursement of products and services provided for purposes of outpatient dialysis, ***regardless of***

11   ***the condition causing the need for dialysis.***" Plan at 32 (emphasis added).[6]

12          Lacking a substantive basis for its argument, DaVita makes repeated emotional appeals to

13   the specter of ESRD patients facing a "choice" between (1) death, (2) crippling debt from balance-

14   billing, or (3) a switch to Medicare. Response at 3, 13. This purported dilemma has no basis in

15   reality. A beneficiary would only face such a "choice" if he or she were in fact subject to balance

16   billing. But the very premise of DaVita's MSPA claim is that all ESRD patients are eligible for

17   Medicare; thus *all* may enroll in Medicare and have Medicare as a *secondary* payer such that—as

18   DaVita admits—they cannot be balance-billed. *See id*. at 3. Moreover, DaVita does not allege it

19   ever balance-billed Patient 1; indeed, its Response implicitly admits it has not. *See id*. at 8-9.[7]

20

21

---

22          [6] DaVita tries to distinguish *National Renal Alliance* on the basis that it did not involve

23   elimination of "*all* in-network coverage," Resp. at 14 (emphasis by DaVita); but that decision did
     not turn on the provision of in-network care—nor plausibly could it, as the "in-network/out-of-

24   network" distinction is a matter of discretionary plan design. *See infra,* Section I.D.1.

25          [7] In parallel lawsuits against other ERISA plans that have sought to limit outrageous
     charges for dialysis, DaVita has similarly raised the specter of balance-billing or death, but has

26   nevertheless ***admitted*** that (1) Medicare (which all ESRD patients are entitled to use as a
     secondary payer) does not allow balance billing, and (2) DaVita "has not . . . balance billed Plan

27   participants." Resp. to Mot. to Dismiss, 8 & n.4, ECF No. 31, *Star Dialysis, LLC v. WinCo Foods*
     *Employee Benefits Plan*, No. 18-cv-00482 (D. Id.).

28

1

2

**D.      DaVita Has No Cause of Action under ERISA.**

*(1)     DaVita has no viable denial-of-benefits claim under ERISA.*

DaVita argues that its ERISA denial-of-benefits claim survives based on Amy's "complete network elimination" for dialysis services, and "improper reimbursement of dialysis claims at Medicare-based rate," "because the Plan does not authorize either of the steps." Response at 20. Once again, however, the plain terms of the Plan document bely DaVita's claims. First, DaVita argues that the Plan "nowhere authorizes" elimination of in-network treatment for dialysis. *Id*. at 21. But this is inaccurate and confuses the issue. The Plan clearly details how dialysis claims will be processed. Plan at 32-33. It further includes a chart showing that the distinction between in-network and out-of-network providers does not apply to dialysis; rather, the Dialysis Program governs all dialysis claims. *Id*. at 10. "In-network treatment" is not a default feature of ERISA plans that must be expressly disclaimed or otherwise implemented; it is a discretionary feature that Amy's Plan chose not to adopt for dialysis claims. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995) ("ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits.").

The court in *Doe One v. CVS Pharmacy, Inc.*, 348 F. Supp. 3d 967 (N.D. Cal. 2018), rejected DaVita's argument on similar facts. There the plaintiff sought to premise its denial-of-benefits claim on ERISA plans' designation of community pharmacies—which HIV/AIDS patients such as the plaintiff particularly relied upon—as no longer "in-network." *Id*. at 992. The court held that this elimination of network services could not support an ERISA denial-of-benefits claim because the plans had eliminated the sought-after network coverage and therefore the plaintiff's "challenge [was] to the overall scope of the plan, not denial of benefits under the plan." *Id*. DaVita's argument in this case is the same. DaVita challenges elimination of in-network coverage for dialysis, but neither the Plan's terms nor the law *requires* the availability of in-network dialysis providers. As in *CVS Pharmacy*, the Plan "do[es] not confer the benefit [DaVita] seek[s]," and the denial-of-benefits claim fails. *Id.*

DaVita further argues that "the Plan's terms likewise preclude reimbursement pegged to the Medicare fee schedule," Response at 21, but again mischaracterizes the terms of the Plan. The

1    Plan (1) requires that the plan administrator calculate a "Usual and Reasonable rate" taking into

2    consideration "the average payment actually made for reasonably comparable services" by "*all*

3    types of plans," which necessarily includes Medicare payments; and (2) grants the administrator

4    full discretion in applying the Dialysis Program's terms. Plan at 33, ¶¶ d(iv) & f (emphasis added).

5    DaVita's repeated insistence that the Plan forbids considering Medicare rates is facially untrue.

6        Finally, DaVita argues that the Plan's administrator "abused its discretion in eliminating

7    network protection and reimbursing Patient 1's treatment at Medicare-based levels," explaining

8    that a plan administrator abuses its discretion "when it acts under an interpretation of the plan that

9    contradicts the plan's plain meaning." Response at 21. As DaVita therefore admits, a *design*

10   *decision* (such as eliminating the in-network/out-of-network structure for dialysis) is not an abuse

11   of discretion, as it does not "interpret" any provision of a plan. And DaVita's concession accords

12   with the case law holding that ERISA does not dictate the particular benefits a plan must provide.

13   *See, e.g.*, *Curtiss-Wright Corp.*, 514 U.S. at 83; *Lockheed Corp. v. Spink*, 517 U.S. 882, 890

14   (1996) ("[P]lan sponsors are generally free under ERISA, for any reason at any time, to adopt,

15   modify, or terminate welfare plans."). As for reimbursement at Medicare rates, as explained

16   above, DaVita simply mischaracterizes what the Plan permits.

17                    *(2)    DaVita cannot state a claim for breach of fiduciary duty.*

18        DaVita's claim for breach of fiduciary duty under ERISA similarly fails upon a reading of

19   the Plan document. DaVita asserts that the Plan misleads participants needing dialysis to believe

20   they will "continue to have in-network protections if they visit preferred providers" and "will

21   receive reimbursement at a non-Medicare based rate," and fails to disclose they "will be exposed

22   to balance billing." Response at 19. Once again, however, DaVita's assertion is contradicted by

23   the Plan document. The Plan never states that dialysis will be provided on an in-network basis; to

24   the contrary, it expressly states that the Dialysis Program entirely governs dialysis treatment, Plan

25   at 10, and the phrase "in-network" does not appear anywhere in the description of that program,

26   *see id.* at 32-33. In fact, the Plan makes clear that even where a provider "is or has been a

27   preferred provider," that provider's payments are subject to the Dialysis Program. *Id.* at 33, ¶ d(ii).

28        The Plan similarly sets forth exactly how rates will be calculated, and DaVita's Complaint

1   does not allege the Plan miscalculated those rates pursuant to the Plan. Instead, DaVita's

2   Complaint alleges that "the Plan adopted a Medicare-based method" for making payments.

3   Complaint at 15. Even if this allegation were true, it does not contradict the terms of the Plan, as

4   explained above. *See supra* Section D(1). The Plan states in simple, straightforward language what

5   it will pay with respect to dialysis: "<u>Maximum Benefit</u>. The maximum Plan benefit payable to

6   dialysis-related claims subject to the payment limitation shall be the Usual and Reasonable Charge

7   for covered services and/or supplies, after deduction of all amounts payable by coinsurance or

8   deductibles." *Id.* at 33. The "Usual and Reasonable Charge" is expressly defined. *Id.* In short, the

9   Plan clearly states the maximum it will cover with respect to dialysis; a patient may necessarily be

10  responsible for the rest. There is nothing misleading or deceptive about the Plan's plain terms.[8]

11              *(3)*     ***DaVita cannot assert an MSPA claim via ERISA.***

12          The plain text of ERISA's civil enforcement provision forecloses DaVita's novel claim

13  that it may use an ERISA breach of fiduciary claim as a backdoor means for bringing a claim

14  under the MSPA. ERISA only permits claims to enjoin violations of "this subchapter or the terms

15  of the plan," or "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to

16  enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

17          Moreover, the Supreme Court has held squarely that ERISA's civil enforcement provision

18  cannot be used as a vehicle to bring non-ERISA claims. As the Court stated in *Peacock v. Thomas*,

19  516 U.S. 349 (1996), ERISA "does not, after all, authorize 'appropriate equitable relief' *at large*,

20  but only 'appropriate equitable relief' for the purpose of 'redressing any violations or ... enforcing

21  any provisions' of ERISA or an ERISA plan." *Id.* at 353 (alteration and citation omitted, emphasis

22  in original). *See also Moon v. BWX Techs., Inc.*, 577 F. App'x 224, 228 (4th Cir. 2014) (a claim

23  "under 29 U.S.C. § 1132(a)(3) is available ***only*** to redress violations of ERISA or the [Benefits]

24

25          [8] DaVita baldly asserts, with no citation or support whatsoever, that Amy's failure to
    specifically argue against an injunction in its opening brief "is enough, standing along, for the
26  fiduciary breach claim to proceed." Response at 23. This is nonsensical. Amy's motion thoroughly
    argues and establishes that no claim for fiduciary breach can succeed. *See* Motion at 17-19. Since
27  the substantive claim fails, *no* remedy for such a claim is available.

28

Plan"); *Westfall v. Bevan*, No. CIV.A.308-CV-0996-D, 2009 WL 111577, at *9 (N.D. Tex. Jan. 15, 2009) ("As the language of § 502(a)(3) makes clear. . . these remedies are available ***only*** when the plaintiff seeks to enforce the provisions of ERISA or the terms of a plan or to redress violations of either."); *Nw. Mut. Life Ins. Co. v. Resolution Tr. Corp*., 848 F. Supp. 1515, 1520 (N.D. Ala. 1994) (same) (all emphases added).[9]

Furthermore, allowing a plaintiff to bring a claim for violation of the MSPA via ERISA—even though Medicare has made no actual payments—would detach the MSPA's limited right of action from the MSPA's clear purpose of protecting the Medicare fisc. *Cf. Harris Corp. v. Humana Health Ins. Co. of Fla*., 253 F.3d 598, 604 (11th Cir. 2001) (MSPA cause of action not available where "Medicare is not a party" and its "fiscal integrity . . . is not at risk."); *Baptist Mem. Hosp.,* 45 F.3d at 998 (MSPA's "sole interest" is to ensure Medicare is a secondary payer); *Perry v. United Food & Comm. Workers Dist. Unions*, 64 F.3d 238, 243 (6th Cir. 1995) (MSPA "does not apply" when Medicare's "fiscal integrity is not threatened"). DaVita has not pleaded facts showing a violation of the MSPA; but even if it had, it could not seek relief via ERISA.

### E.     DaVita Has No Right to Surcharge, Reformation, or Estoppel.

To claim entitlement to surcharge, DaVita resorts solely to misstating the Plan's language as providing "inadequate disclosures." DaVita provides no citation to the actual Plan document, but cites only to its own allegations in the Complaint, which are negated by the Plan's plain terms setting forth the precise parameters of the Dialysis Program in clear language. Plan at 10, 32-33.

With respect to reformation, DaVita uses a diversionary tactic, arguing it does not matter whether the fraud required to support that remedy was "intentional." Response at 24. That is entirely beside the point, because DaVita has not pleaded any "fraud" at all, intentional or otherwise. As explained above, there is no provision that the Plan "failed to disclose." DaVita

---

[9] DaVita argues that *Bio-Medical* permits a plaintiff to bring a suit under ERISA for a violation of the MSPA. Resp. at 14-15. But *Bio-Medical* did not address any claim for breach of fiduciary duty or equitable relief (nor could it have allowed such a claim in light of *Peacock*), nor did it analyze whether ERISA was in fact a permissible vehicle for redressing claims arising under a different act or cite any law allowing ERISA to be used in that manner. *See* 656 F.3d at 283-84.

1    pleads differently, but its pleading cannot be accepted at face value when it contradicts the Plan

2    document.

3         Finally, DaVita argues (without citation) that the estoppel remedy is available because "the

4    Plan facially tells participants they *will* have network protections and *will* be reimbursed at non-

5    Medicare based rate." Response at 24 (emphasis in original). DaVita again cites no provision of

6    the Plan for this statement; indeed, it cannot cite any such support because there is none.[10]

7         **F.    DaVita Fails to Plead Any Viable Claims under State Law.**

8         DaVita's state law claims are all preempted. Motion at 22-23. DaVita makes no argument

9    to the contrary (and indeed concedes preemption may apply), except for a single footnote citing

10   *Curtis v. Nevada Bonding Corp.*, 53 F.3d 1023, 1027 (9th Cir. 1995), *over'd in part, Leeson v.*

11   *Transamerica Disability Income Plan*, 671 F.3d 969 (9th Cir. 2012), for the proposition that

12   preemption cannot apply if recovery under ERISA is barred for "any reason." Response at 25 n.16.

13   This is incorrect. The *Curtis* decision stands only for the more limited point that if a plaintiff *lacks*

14   *ERISA standing* to bring an ERISA claim, then its state law claims will not be preempted. 53 F.3d

15   at 1027. And it is certainly not true that failure of an ERISA claim "for any reason" avoids

16   preemption. To the contrary, federal courts have "routinely" found ERISA to preempt state law

17   actions even where ERISA provides no remedy. *Olson v. Gen. Dynamics Corp.*, 960 F.2d 1418,

18   1424 (9th Cir. 1991) (Reinhart, J., concurring) (collecting cases).

19

20

---

21        [10] DaVita cites *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945 (9th Cir. 2014) for the
22   proposition that "evidence that plaintiffs are particularly vulnerable" establishes extraordinary
     circumstances so as to justify estoppel. Resp. at 24. First, the "particularly vulnerable" rule applies
23   only after the threshold requirements of estoppel have been met, which here they have not. *See*
     *Gabriel*, 773 F.3d at 956-57. Second, the only cases to actually apply a "particularly vulnerable"
24   rule illustrate that it is a case-by-case determination that turns on an individual's particular
     circumstances—for instance, receiving a blatant misrepresentation of coverage while in the shock
25   of "a sudden tragic loss," or receiving repeated false statements of coverage while "continually
     and totally disabled in the hospital." *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 238
26   (3d Cir. 1994) (reviewing cases). No case supports treating the entire of class of ESRD patients,
     many of whom receive dialysis as a routine outpatient procedure, as "particularly vulnerable" so
27   as to permit estoppel under ERISA.

28

Lastly, even if DaVita's state law claims were not preempted, nothing in DaVita's Response addresses the stark reality that DaVita has not and cannot allege facts plausibly supporting its state law claims. First, DaVita pleads no negligent misrepresentation, nor can it do so in light of the Plan's plain terms setting forth its method of paying claims. DaVita attempts to reframe its own pleadings to support a claim; but the Complaint passage it cites alleges the Plan "misled DaVita about *the payments they could expect for rendering services*." Compl. ¶ 92. Expectations of future payment cannot support a negligent misrepresentation claim. *See* Motion at 24. Second, with regard to promissory estoppel, DaVita's statement that "a non-Medicare-based rate is *required* by the Plan," Resp. at 25 (emphasis in original) again cites no Plan provision because the Plan includes no such requirement. *See supra*, Section I.D.1. Third, DaVita has not pleaded any facts to support quantum meruit, and again cannot do so. DaVita cites no case law for its assertions that the Plan need not have agreed to pay any particular rate to sustain a claim for quantum meruit (and the assertion is incorrect, *see, e.g., Pac. Bay Recovery, Inc. v. Cal. Phys.' Servs., Inc.*, 12 Cal. App. 5th 200, 215 (Ct. App. 2017)), and that Amy's knowledge of Patient 1's ongoing treatment somehow constitutes a "request" for services (an assertion that is implausible on its face).

## II.    CONCLUSION

DaVita's claims depend on allegations that are directly contradicted by the plain terms of the Plan, and therefore cannot be taken as true on motion to dismiss. Moreover, its remaining factual allegations do not state any plausible claim under the governing law. DaVita's claims fail as a matter of law and cannot be cured through amendment. Defendants' motion should be granted and the Complaint dismissed in its entirety, with prejudice.

DATED: March 8, 2019

By:     */s/ Floyd G. Short*
FLOYD G. SHORT *(pro hac vice)*
KATHERINE M. PEASLEE (Cal. Bar # 310298)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101

Telephone: (206) 516-3880
Fax: (206) 516-3883
fshort@susmangodfrey.com
kpeaslee@susmangodfrey.com

CATRIONA LAVERY (CA Bar #310546)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Fax: (310) 789-3150
clavery@susmangodfrey.com

*Attorneys for Defendants*

1

**CERTIFICATE OF SERVICE**

2      I certify that on March 8, 2019, I electronically filed the foregoing paper with the Clerk of the

3  Court using the Court's ECF system which will send notification of such filing to attorneys of

4  record:

5

6   | **TRIS & MAHER LLP** | |
    | PETER K. STRIS (SBN 216226) | |
7   | peter.stris@strismaher.com | |
    | BRENDAN S. MAHER (SBN 217043) | |
8   | brendan.maher@strismaher.com | |
    | MICHAEL DONOFRIO (*pro hac vice* | |
9   | pending) | |
    | michael.donofrio@strismaher.com | |
10  | RACHANA A. PATHAK (SBN 218521) | |
    | radha.pathak@strismaher.com | |
11  | 725 South Figueroa Street, Suite 1830 | |
    | Los Angeles, CA 90017 | |
12  | T: (213) 995-6800 | F: (213) 261-0299 | |
    | *Attorneys for Plaintiffs DAVITA INC. and* | |
13  | *STAR DIALYSIS, LLC* | |

14

15

16                                      */s/ Katherine M. Peaslee*

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28